The **TORRINGTON COMPANY**, Plaintiff–Appellant,

and

**Federal–Mogul Corporation, Plaintiff,**

v.

The **UNITED STATES, Defendant–Appellee,**

and

**SKF USA Inc. and SKF (U.K.) Limited, Defendants–Appellees.**

94–1117.

United States Court of Appeals, Federal Circuit.

Jan. 13, 1995.

---

Terence P. Stewart, Stewart & Stewart, of Washington, DC, argued for plaintiff-appellant. With him on the brief were James R. Cannon, Jr. and Patrick J. McDonough. Of counsel was Myron A. Brilliant.

Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin., Berniece A. Browne, Sr. Counsel and Dean A. Pinkert, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel. Herbert C. Shelley, Howrey & Simon, of Washington, DC, argued for defendants-appellees. With him on the brief was Alice A. Kipel.

Before ARCHER, Chief Judge, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

The Torrington Company (Torrington) appeals the judgment of the United States Court of International Trade rejecting Torrington's and Federal–Mogul Corporation's challenge to an antidumping administrative review. *Torrington Co. v. United States*, 824 F.Supp. 1095 (Ct.Int'l Trade 1993) (*Torrington I* ), *after remand*, 834 F.Supp. 1405 (Ct. Int'l Trade 1993) (*Torrington II* ). The Court of International Trade refused to reach Torrington's challenge to the International Trade Administration's (ITA) method of calculating the assessment rate and cash deposit rate for imported merchandise because it was moot. The Court of International Trade also affirmed ITA's decision to adjust the foreign market value of the bearings for imputed inventory carrying costs. This court affirms.

## BACKGROUND

Antidumping laws protect domestic industries from actual, or likely, sales of imported goods at less than fair value. 19 U.S.C. § 1673.[1] When the International Trade Commission finds that imports injure or threaten to injure United States industry, Title 19 authorizes imposition of a special duty on such imported goods. This antidumping duty equals the amount by which the foreign market value of the merchandise exceeds the United States price. *Id.*

ITA, an agency of the Department of Commerce, determines the foreign market value and the United States price of imported products. Foreign market value generally refers to the price of the merchandise in the home market of the exporting foreign country. 19 U.S.C. § 1677b(a)(1)(A). In the absence of sufficient home market sales, ITA bases foreign market value on either the sales price in countries other than the United States, 19 U.S.C. § 1677b(a)(1)(B), or a "constructed value," 19 U.S.C. § 1677b(a)(2).

█ ITA calculates United States price in terms of (i) the purchase price or (ii) the exporter's sales price. 19 U.S.C. § 1677a. Purchase price sales occur between a foreign manufacturer and an independent United States importer. Purchase price is the "actual or agreed-to price between the foreign producer and the independent importer, prior to the time of importation." *Smith–Corona Group v. United States,* 713 F.2d 1568, 1572, 1 Fed.Cir. (T) 130, 133 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); 19 U.S.C. § 1677a(b). Exporter's sales price sales, on the other hand, occur between a foreign manufacturer and its related importer, such as a United States subsidiary. Exporter's sales price is "the price at which the foreign manufacturer or its agent sells or agrees to sell the merchandise in the United States." *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 399 n. 2, — Fed.Cir. (T) —, — n. 2 (1994) (citing *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1577, — Fed. Cir. (T) —, — (1993)); 19 U.S.C.

§ 1677a(c). To calculate exporter's sales price, ITA first measures the price at which goods are ultimately resold to an independent party in the United States. This price is then subject to several mandatory statutory adjustments to arrive at exporter's sales price. Thus, as with purchase price sales, ITA arrives "at a United States price that reflects the price that the [goods] would command in 'an arms-length transaction, whether from the importer to an independent retailer or directly to the public.' " *Koyo Seiko, Co. v. United States,* 36 F.3d 1565, 1567, — Fed.Cir. (T) —, — (1994) (quoting *Smith–Corona,* 713 F.2d at 1572).

"To ensure that the quantum of antidumping duties is calculated in a fair manner," ITA adjusts both foreign market value and United States price. *Koyo Seiko,* 36 F.3d at 1568.

> Foreign market value and United States price represent prices in different markets affected by a variety of differences in the chain of commerce by which the merchandise reached the export or domestic market. Both values are subject to adjustment in an attempt to reconstruct the price at a specific, "common" point in the chain of commerce, so that value can be fairly compared on an equivalent basis. While the statute does not specify *where* in the chain of commerce price is constructed, the specific statutory adjustments appear to indicate an 'f.o.b. foreign port' price.

*Smith–Corona,* 713 F.2d at 1571–72 (emphasis in original); *see* 19 U.S.C. § 1677a(d) (adjustments applicable to both purchase price and exporter's sales price); 19 U.S.C. § 1677a(e) (adjustments applicable to exporter's sales price); 19 U.S.C. § 1677b(a)(4) (adjustments applicable to foreign market value).

After making these price adjustments, ITA calculates the dumping margin by subtracting the United States price from the foreign market value. 19 U.S.C. § 1675(a)(2). The dumping margin provides the basis for assessment of antidumping duties. It also provides the basis for cash deposits of estimated duties for future entries. *Id.*

---

1. All citations to the United States Code refer to the 1988 edition, unless otherwise indicated.

The antidumping duty order at issue covers imports of antifriction bearings from the United Kingdom. *Ball Bearings and Cylindrical Roller Bearings and Parts Thereof From the United Kingdom*, 54 Fed.Reg. 20,910 (Dep't Comm.1989). SKF (U.K.) Ltd. exported goods covered by the duty order from the United Kingdom, and SKF USA Inc. sold them in the United States. *Id.* SKF (U.K.) Ltd. and SKF USA Inc. are defendant intervenors in this case.

ITA initiated its first administrative review of the order on June 11, 1990. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom*, 55 Fed.Reg. 23,575 (Dep't Comm.1990) (initiation of antidumping admin. reviews). This review covered antifriction bearings imported between November 9, 1988 and April 30, 1990. *Id.* ITA published its preliminary determination on March 15, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the United Kingdom*, 56 Fed. Reg. 11,197 (Dep't Comm.1991) (preliminary results of antidumping duty admin. reviews) (*Preliminary Results*). On July 11, 1991, ITA reported the final results of its administrative review. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From the United Kingdom*, 56 Fed. Reg. 31,769 (Dep't Comm.1991) (final results of antidumping duty admin. reviews) (*Final Results*).

ITA calculated duty assessment rates for exporter's sales price sales during the period of review and cash deposit rates for estimated duties on future entries. *Final Results*, 56 Fed.Reg. at 31,771–72. ITA based both calculations on potential uncollected dumping duties (PUDD), measured generally as the difference between foreign market value and United States price. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany*, 56 Fed.Reg. 31,692, 31,698 (Dep't Comm.1991) (final results of antidumping

duty admin. review) (*Issues Appendix*) (explaining how ITA calculated assessment rate and cash deposit rate).[2] ITA did not, however, use the same method to calculate duty assessment rates and cash deposit rates. *Final Results*, 56 Fed.Reg. at 31,771–72. ITA calculated the assessment rate for exporter's sales price sales by dividing the total PUDD for each importer by the *total entered value* of its reviewed sales. *Id.* To compute the cash deposit rate, however, ITA divided the total PUDD for each exporter by the *total United States price value* for that exporter's sales during the review period. *Id.* In sum, ITA calculated the assessment rate as a percentage of entered value and the cash deposit rate as a percentage of United States price. ITA explained this difference:

> Section 731 of the Tariff Act [19 U.S.C. § 1673] defines an antidumping duty as the amount by which foreign market value exceeds United States price. As the Department has stated on numerous occasions, duty deposits are merely *estimates* of future dumping liabilities.

*Issues Appendix*, 56 Fed.Reg. at 31,699 (emphasis added).

To arrive at the appropriate assessment and cash deposit rates, ITA first had to calculate the United States price and the foreign market value. When calculating the United States price based upon exporter's sales price transactions, ITA adjusted the exporter's sales price for inventory carrying costs. ITA also made a corresponding deduction to the foreign market value. *Issues Appendix*, 56 Fed.Reg. at 31,727; *see Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From United Kingdom*, 56 Fed.Reg. 11,197 (Dep't Comm.1991) (prelim. results of antidumping duty admin. review). ITA measured the inventory carrying costs from the date the exporter completed production of the merchandise. *Issues Appendix*, 56 Fed.Reg. at 31,727.

---

**2.** The International Trade Administration (ITA) had before it concurrent administrative reviews of imports of antifriction bearings from nine countries, including the United Kingdom. ITA held a hearing on general issues pertaining to all nine administrative reviews. ITA then published the results of these hearings in the *Issues Appendix*.

ITA made these parallel deductions from the foreign market value and the exporter's sales price to ensure a fair price comparison. *Id.* As to the United States price, ITA explained:

> [ITA] adjusts for inventory carrying costs on U.S. sales through imputation because the actual financial cost, for the time between shipment from the parent and payment by the related importer, is generally borne by the foreign parent. Therefore the cost will not be found on the books of the importer, but submerged in the accounts of the parent with other financial costs. As a result, some of the selling expenses associated with the U.S. sales are not directly identifiable.

*Id.* As to foreign market value, ITA continued:

> Similarly, in the home [foreign] market, although the actual cost of carrying inventory is on the books of the seller, it will be commingled with all other interest expenses, and classified as a general and administrative expense rather than as a selling expense. As is the case for the U.S. sales, the actual amount is not identifiable. Therefore, it is appropriate to impute this cost in both markets, since the nature of the expense is the same, and the same difficulty exists in determining the actual costs in each market.

*Id.*

The Court of International Trade rejected Torrington's challenge to ITA's method of calculating cash deposit rates differently from assessment rates. *Torrington I,* 824 F.Supp. at 1097–98. The Court of International Trade found that ITA's subsequent publication of superseding cash deposit rates made the deposit issue moot. *Id.* at 1098. In addition, the court referred to its decision in *Federal–Mogul Corp. v. United States,* 813 F.Supp. 856, 866–68 (Ct.Int'l Trade 1993), supporting the reasonableness of ITA's cash deposit rate calculation. *Torrington I,* 824 F.Supp. at 1098. The Court of International Trade also affirmed ITA's adjustment to foreign market value for imputed inventory carrying costs under 19 C.F.R. § 353.56(b)(2) (1991). *Id.* Torrington appeals both issues to this court.

## DISCUSSION

■ This court reviews ITA's interpretation of the antidumping laws *de novo. Koyo Seiko,* 36 F.3d at 1570. In conducting that review, however, this court defers to ITA's statutory interpretation where the statute is silent or ambiguous on the disputed issue. *Id.; see Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1516, —— Fed.Cir. (T) ——, —— (Fed.Cir.1993) (this court reviews whether ITA's interpretation of a statutory provision falls within the range of permissible construction), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994); *Zenith Elecs.,* 988 F.2d at 1583 (reviewing whether "Commerce applied a reasonable interpretation of the statute in this case").

### I. Cash Deposit Rates

■ A court with jurisdiction under Article III of the Constitution will not decide cases that are moot because of an absence of "subject matter on which the judgment of the court can operate." *Ex Parte Baez,* 177 U.S. 378, 390, 20 S.Ct. 673, 677, 44 L.Ed. 813 (1900). A claim is not moot, however, if the action "originally complained of is 'capable of repetition, yet evading review.'" *Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)); *Southern Pac. Terminal Co. v. Interstate Comm. Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). To qualify for this exception, the challenged action must meet two conditions. First, the action must "in its duration [be] too short to be fully litigated prior to its cessation or expiration." *Cambridge Lee Indus., Inc. v. United States,* 916 F.2d 1578, 1581 (Fed.Cir.1990) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). Second, there must be "a 'reasonable likelihood' that the party 'will again suffer the [injury] that gave rise to the suit.'" *Cambridge,* 916 F.2d at 1581 (quoting *Honig,* 484 U.S. at 318, 108 S.Ct. at 601).

The Trade Agreements Act of 1979, 19 U.S.C. §§ 2501–2582 (1988 & Supp. V 1993), authorizes ITA to conduct annual administra-

tive reviews of dumping findings upon the request of an interested party. *See* 19 U.S.C. § 1675(a). During such a proceeding, ITA reviews the estimated antidumping duty and determines the actual antidumping duty for the prior review period. The administrative review effectively updates the antidumping duty order. Under ITA's administrative practice, ITA can publish superseding cash deposit rates as frequently as once per year, as a result of successive administrative reviews.

 ITA thus can impose a new cash deposit rate before interested parties can fully litigate the method of calculating the cash deposit rate for the prior administrative review. This situation arose in this case. By the time this court heard oral argument in this case, opportunity for three administrative reviews had overtaken the events, and a fourth was imminent. *See, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France,* 57 Fed.Reg. 28,360 (Dep't Comm.1992) (final results of antidumping duty admin. reviews); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom,* 58 Fed.Reg. 39,729 (Dep't Comm.1993) (final results of antidumping duty admin. reviews); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom,* 59 Fed.Reg. 32,180 (Dep't Comm.1994) (initiation of antidumping duty admin. reviews).

The record shows that litigation cannot keep pace with the rate of administrative reviews. ITA calculates a new cash deposit rate before full adjudication of the old rate can take place. In addition, a reasonable likelihood exists that Torrington—currently an active participant in antidumping duty litigation—will face the same cash deposit rate issue again. Therefore, this question falls within the exception to the mootness doctrine for recurring, short-term conduct. *Honig,* 484 U.S. at 318, 108 S.Ct. at 601. The trial court erred in declaring the cash deposit rate issue moot.

Because the issue is ripe for adjudication, this court turns to the merits of that question. Calculation of cash deposit rates and assessment rates during an administrative review must comply with 19 U.S.C. § 1675(a)(2):

> For the purpose of [reviewing and determining the amount of any antidumping duty during a section 1675(a)(1) annual administrative review], the administering authority shall determine—
>
> (A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and
>
> (B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.
>
> The administering authority ... shall publish notice of the results of the determination of antidumping duties ... and *that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.*

*Id.* (Emphasis added.)

 Section 1675(a)(2) does not require the same method of calculation for assessment rates and cash deposit rates. Nor does it specify a particular divisor when calculating either assessment rates or cash deposit rates. Rather, the statute merely requires that PUDD, the difference between foreign market value and United States price, serve as the basis for both assessed duties and cash deposits of estimated duties. ITA based its calculation of both rates on PUDD. Thus, ITA's use of different methods for calculating these rates does not conflict with the statute.

 Moreover, Title 19 bases the cash deposit rate on *estimated* antidumping duties on future entries. *See* 19 U.S.C. § 1673f (providing for refund or collection of over- and under-payments of estimated duty deposits); 19 U.S.C. § 1673b(d)(2) (administering authority must order posting of a cash deposit equal to the "estimated average

amount by which the foreign market value exceeds the United States price"); 19 U.S.C. § 1673e(a)(3) (administering authority must publish an order requiring "the deposit of estimated antidumping duties"). Thus, Title 19 requires only cash deposit estimates, not absolute accuracy. These estimates need only be reasonably correct pending the submission of complete information for an actual and accurate assessment. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 69 (1979).

■ Finally, ITA's use of the total United States price, instead of entered value, as a divisor to calculate cash deposit rates does not result in consistent underpayment of estimated duties. Statutory United States price, in this case exporter's sales price, is subject to both upward and downward adjustment, depending on many factors. *Zenith Elecs.*, 988 F.2d at 1577. This calculation may change between administrative reviews. It is "by no means true" that "future [United States price] will be the same as current [United States price] and will always be greater than entered value." *Federal–Mogul*, 813 F.Supp. at 868. ITA cannot predict whether use of the entered value for any given review period would produce a more accurate cash deposit rate. No evidence compels this court to find that deriving cash deposit rates from entered values leads to a more accurate estimation of future duties than reliance on total United States price.

ITA followed the statute in arriving at estimated duties. This court agrees with the Court of International Trade that ITA did not err by basing cash deposit rates on statutory United States price instead of entered Customs value.

## II. Inventory Carrying Costs

■■ The remaining issue is whether ITA properly deducted inventory carrying costs from foreign market value as an indirect selling expense. ITA may adjust ex-

porter's sales price and foreign market value for indirect selling expenses. Indirect selling expenses are those expenses that do not vary with the quantity sold. *Koyo Seiko*, 36 F.3d at 1569 n. 4. Title 19 permits ITA to deduct indirect selling expenses from exporter's sales price. Specifically, section 1677a(e)(2) encompasses indirect selling expenses incurred by a foreign manufacturer on behalf of its related United States importer:

> [T]he exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—
>
> . . . .
>
> (2) expenses generally incurred by or for the account of the exporter in the United States *in selling* identical or substantially identical merchandise....

19 U.S.C. § 1677a(e)(2) (emphasis added); *see also* 19 U.S.C. § 1677(13) ("exporter" includes the related United States importer).

■ Commerce, perceiving unfairness in allowing a deduction for indirect selling costs from exporter's sales price and not from foreign market value, promulgated 19 C.F.R. § 353.15(c) (1980), now codified at 19 C.F.R. § 353.56(b). This regulation permits ITA to deduct indirect selling expenses from foreign market value:

> In comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses ... incurred in selling such or similar merchandise up to the amount of the expenses ... incurred in selling the merchandise.

19 C.F.R. § 353.56(b)(2).[3] This special adjustment to foreign market value, applicable in exporter's sales price transactions, is known as the exporter's sales price offset, or "ESP offset." *See Smith–Corona*, 713 F.2d at 1577–79.

Although not specifically authorized by statute,[4] this court has held the ESP offset

---

**3.** The language of this regulation was originally published in 1976 and codified at 19 C.F.R. § 153.10(b) (1976) (last sentence). 41 Fed.Reg. 26,204 (1976). Following the Trade Agreements Act of 1979, ITA published new regulations relating to antidumping duties. New regulation 19 C.F.R. § 353.15 retained the substance of 19 C.F.R. § 153.10. 45 Fed.Reg. 8,185 (1980).

**4.** The ESP offset is not a "circumstance of sale" adjustment authorized under 19 U.S.C. § 1677b(a)(4)(B). *See Smith–Corona Group v. United States*, 713 F.2d 1568, 1579 (Fed.Cir. 1983) (the ESP offset is not "based on *differences* in the circumstances of sale but, rather, on similarities.") (emphasis in original).

valid as a reasonable exercise of the Secretary of Commerce's authority to administer the antidumping laws fairly. *Smith–Corona,* 713 F.2d at 1579. The ESP offset enables a *"fair* comparison between foreign and domestic market prices or values." *Consumer Prods. Div. v. Silver Reed Am., Inc.,* 753 F.2d 1033, 1037, 3 Fed.Cir. (T) 83, 87 (1985); *see also Koyo Seiko,* 36 F.3d at 1574 ("[B]ecause indirect expenses were allowed to be deducted from exporter's sales price, Commerce may properly offset that deduction by a similar deduction from foreign market value as well.").

In this administrative review, ITA determined that inventory carrying costs are indirect selling expenses deductible from exporter's sales price and foreign market value. ITA deducted inventory carrying costs from exporter's sales price under section 1677a(e)(2). *Issues Appendix,* 56 Fed.Reg. at 31,727. For exporter's sales price transactions, ITA made a parallel deduction from foreign market value. *Id.* Furthermore, ITA measured inventory carrying costs from the date of production.

ITA's practice was a reasonable exercise of ITA's discretion in administering the antidumping laws. In another proceeding involving the same issue, ITA reasoned:

> While the Department's original adjustment for inventory carrying costs may have been motivated by concerns that costs normally borne by a U.S. subsidiary could be shifted to the foreign parent, in order for comparisons to be fair, it is necessary to make similar adjustments to foreign market value. That the foreign seller chooses to sell from inventory in the home market is no different from a seller's decision to undertake ESP transactions in the United States. *Because the seller incurs the opportunity cost of holding inventory in both markets, and because we adjust for that cost in the U.S. market, we must also adjust for the same cost in the home market.*
>
> . . . .
>
> Ideally, we would start at the point where home market and U.S. merchandise are separated, *i.e.,* the last common point of the production/distribution chain for home

market and U.S. merchandise. In many cases, such as in these investigations, this will be when the merchandise rolls off the production line.

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof, From the Federal Republic of Germany,* 54 Fed. Reg. 18,992, 19,050 (Dep't Comm.1989) (final determination of sales at less than fair market value) (emphasis added); *see also Industrial Phosphoric Acid from Belgium,* 52 Fed. Reg. 25,436, 25,439 (Dep't Comm.1987) ("Inventory is held from the time of production to sale. Accordingly, it is appropriate to calculate the inventory carrying costs from the date of production."); *Antidumping Duties,* 54 Fed.Regs. 12,742, 12,769 (Dep't Comm.1989) (ITA's revision of regulation 353.56(b)(2) clarifies that "the indirect selling expenses, whether incurred in the United States or elsewhere, may be offset by indirect selling expenses incurred on sales of such or similar merchandise, regardless of where incurred").

ITA's practice of deducting inventory carrying costs, measured from the production date, from exporter's sales price and foreign market value comports with section 1677a(e)(2) and regulation 353.56(b)(2). This practice also affords a true "apples-to-apples" comparison. *See Smith–Corona,* 713 F.2d at 1579. The opportunity cost of holding inventory accrues from the production date and applies to both export and home market sales. ITA may fairly treat this opportunity cost as an indirect selling expense and, thus, deduct it from exporter's sales price and foreign market value.

■ Moreover, this court finds support for ITA's inventory carrying cost deductions in the United States international trade agreements. Congress enacted the Trade Agreements Act of 1979 to create a comprehensive antidumping statute. As part of the 1979 Act, Congress approved various trade agreements entered into during the Tokyo Round of Multilateral Trade Negotiations (1973–1979). 19 U.S.C. § 2503(a)–(c); *see* 3 Joseph E. Pattison, *Antidumping and Countervailing Duty Laws* § 1.05[2] (1994). One such agreement was the Agreement on Implementation of Article VI of the General

Agreement on Tariffs and Trade (the Revised GATT Antidumping Code). 19 U.S.C. § 2503(c)(6). The Revised GATT Antidumping Code serves as a guide to interpretation of the antidumping laws to the extent it does not conflict with Title 19. 19 U.S.C. § 2504(a). Article 2, paragraph 6, of the Revised GATT Antidumping Code relates to the ESP offset:

> In order to effect a fair comparison between the export price and the domestic price in the exporting country (or the country of origin) ... the two prices shall be compared at the same level of trade, normally at the exfactory level, and in respect of sales made at as nearly as possible the same time.

Revised GATT Antidumping Code, Article 2, ¶ 6, *reprinted in* Pattison, *supra,* App. E. Thus, the Revised GATT Antidumping Code also demands a fair comparison between foreign market value and exporter's sales price and recommends comparison at the date of production. ITA's reliance on the ESP offset to make parallel inventory carrying cost deductions thus comports with Title 19 which references the Revised GATT Antidumping Code.

ITA's interpretation of the adjustment provisions at issue is reasonable. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (if Congress does not address precise question at issue, a court must defer to an agency's reasonable interpretation of a statute). Thus, this court affirms the decision of the Court of International Trade upholding that interpretation.

## CONCLUSION

Although the Court of International Trade erred in holding moot the issue relating to calculation of the superseded cash deposit rate, the court correctly determined, by reference to *Federal–Mogul,* 813 F.Supp. at 866–68, that ITA's use of different methods to calculate the assessment and cash deposit rates complied with statute. Thus, this court affirms the Court of International Trade's decision on this issue. This court also affirms the Court of International Trade's judgment upholding ITA's inventory carrying cost adjustment to foreign market value.

## COSTS

Each party shall bear its own costs.

AFFIRMED.