**NATIONAL STEEL CORP., AK Steel Corp., Bethlehem Steel Corp., Gulf States Steel, Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Co., Sharon Steel Corp., U.S. Steel Group a Unit of USX Corp., and WCI Steel, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Hoogovens Groep B.V. and N.V.W. (U.S.A.), Inc., Defendant–Intervenors.**

**Slip Op. 96–97.**

**Court No. 93–09–00616–AD.**

United States Court of International Trade.

June 14, 1996.

Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer and John J. Mangan), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis), Edward Reisman, Attorney–Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis, and Niall P. Meagher), Washington, DC, for defendant-intervenors.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Chief Judge:

National Steel Corporation, AK Steel Corporation, Bethlehem Steel Corporation, Gulf States Steel, Inc. of Alabama, Inland Steel Industries, Inc., LTV Steel Company, Inc., Sharon Steel Corporation, U.S. Steel Group A Unit of USX Corporation, and WCI Steel, Inc. ("Domestic Producers") contest the final results of the second remand determination filed by Commerce pursuant to this court's order in *National Steel Corp. v. United States*, 913 F.Supp. 593 (Ct.Int'l Trade 1996) [hereinafter *National Steel II* ]. *Redetermination on Reremand; Final Determination of Sales at Less than Fair Value; Certain Hot–Rolled Carbon Steel Flat Products and Certain Cold–Rolled Carbon Steel Flat Products from the Netherlands* (A–421–803/804) (Feb. 12, 1996) [hereinafter *Second Remand Redetermination* ]. The court has jurisdiction over this action pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

In *National Steel Corp. v. United States*, 870 F.Supp. 1130 (Ct.Int'l Trade 1994) [hereinafter *National Steel I* ], the court reviewed challenges to Commerce's investigation of

cold-rolled carbon steel flat products from the Netherlands. *Final Determinations of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products and Certain Cold–Rolled Carbon Steel Flat Products from the Netherlands,* 58 Fed.Reg. 37,-199, *amended by Antidumping Duty Order,* 58 Fed.Reg. 44,172 (Dep't Comm.1993) [hereinafter *Final Determination* ]. In particular, the court reviewed Commerce's selection and application of the highest non-aberrant margin as the best information available (BIA). Although the court upheld Commerce's use of BIA and its selection of the highest non-aberrant margin as BIA, the court found the particular margin that Commerce had chosen appeared aberrant. The court directed Commerce to provide standards for judging the highest non-aberrant margin and to select a BIA margin that would be indicative of Hoogovens' sales.

Further, the court considered Commerce's adjustment to the United States price (USP), which sought to account for the Dutch value added tax (VAT). Commerce sought to eliminate the false dumping margin created when adjusting the VAT by applying the tax *rate* to the USP. To do this, Commerce added to the USP the actual *amount* of the tax imposed on the foreign market value (FMV) in the home market, but forgiven upon exportation. The court, following *Federal–Mogul Corp. v. United States,* 834 F.Supp. 1391 (Ct.Int'l Trade 1993), found this tax-neutral methodology contrary to law, and remanded the tax adjustment to Commerce for recalculation.

On remand, Commerce developed two principles for its selection of the highest non-aberrant margin. First, Commerce sought a margin sufficiently adverse so as to be consistent with the statutory purposes of the BIA rule—to induce respondents to provide Commerce with complete and accurate information in a timely fashion. Second, Commerce sought a margin indicative of Hoogovens' sales. Although Commerce properly reasoned that the BIA rate should be based on transactions involving substantial commercial quantities, Commerce selected its

margin because it found approximately three percent of the transactions by volume had calculated margins higher than the BIA rate. *Redetermination on Remand; Final Determination of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products and Certain Cold–Rolled Carbon Steel Flat Products from the Netherlands* (A–421–803/804) at 5 (Feb. 17, 1995) [hereinafter *First Remand Redetermination* ].

Pursuant to the court's remand, Commerce also changed its methodology to comport with *Federal–Mogul* when adjusting for VAT. *First Remand Redetermination* at 2. Commerce added to the "USP the result of multiplying the foreign market tax rate by the price of the United States merchandise at the same point in the chain of commerce that the foreign market tax was applied to foreign market sales." *Id.* at 2.

Upon review, the court found Commerce's two guidelines for selecting the highest non-aberrant margin reasonable, as Commerce's selected margin now had to have a rational relationship to the foreign manufacturer's sales, and therefore could provide a link to defendant-intervenors', Hoogovens Groep B.V. and N.V.W. (U.S.A.), Inc. ("Hoogovens"), customary selling practices. However, although the court found that Commerce had demonstrated its selected margin as being sufficiently adverse, *First Remand Redetermination* at 5, Commerce had failed to explain how that margin was rationally related to Hoogovens' sales and indicative of Hoogovens' customary selling practices. The court found the mere existence of a significant number of transactions with higher margins than Commerce's selected BIA margin did not necessarily support Commerce's conclusion that its selected margin was indicative of Hoogovens' customary selling practices. Further, while Commerce found that the BIA rate was "a transaction involving a substantial commercial quantity[,]" *id.* at 5, the court determined that Commerce failed to demonstrate why it found Hoogovens' sales to be substantial, and how Commerce defined "substantial" with regard to Hoogovens' sales.

The court also reviewed Commerce's methodology to account for the VAT the exporting country would have assessed had the merchandise in question been sold in the home market. As the Court of Appeals for the Federal Circuit upheld Commerce's original methodology, *Federal–Mogul Corp. v. United States*, 63 F.3d 1572, 1580 (Fed.Cir.1995), this court permitted Commerce to return to it. *National II*, 913 F.Supp. at 598. Pursuant to this methodology, Commerce added the *amount* of the foreign tax, rather than applying the foreign tax *rate*, in calculating the adjustment needed to account for the VAT. *Id.*

The court remanded Commerce's redetermination and: (1) directed Commerce to provide a reasoned explanation to demonstrate how Commerce's selected BIA margin was indicative of Hoogovens' customary selling practices and rationally related to Hoogovens sales; and (2) permitted Commerce the option to reapply its original tax-neutral methodology. *Id.* The results of Commerce's second remand redetermination are now before the court.

## DISCUSSION

■ This court shall uphold Commerce's final determination in an antidumping duty investigation unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)).

## I. Selection of the Highest Non-aberrant Margin

■ Pursuant to the court's instructions, Commerce reexamined its selection of the BIA margin and found that its selected margin was indicative of Hoogovens' customary

selling practices and rationally related to Hoogovens' sales. *Second Remand Redetermination* at 7–8. Commerce found the sale which corresponded to its selected margin involved a product which (1) was common in Hoogovens' Purchase Price and Exporter Sales Price transactions, (2) possessed among the highest sales volumes in terms of tonnage, and (3) for ESP sales, was the product with the largest volume. *Id.* at 8–9.

Further, Commerce also found the particular sale chosen was of a substantial commercial quantity and fell well into the mainstream of Hoogovens' transactions based on quantity. *Id.* Finally, Commerce found nothing in the record to indicate that this particular sale was not transacted in a normal manner. *Id.* The parties have not challenged Commerce's remand redetermination with respect to this issue.

As Commerce's selected margin is both sufficiently adverse to meet the requirements of the BIA rule and indicative of Hoogovens' sales, and as substantial evidence on the record supports Commerce's selection, the court upholds Commerce's determination with respect to its selection of the highest non-aberrant margin.

## II. Recalculation of VAT & the Duty Deposit Rate

Commerce changed its treatment of VAT, as permitted by *Federal–Mogul*, 63 F.3d at 1580. *Second Remand Determination* at 5. Commerce returned to its methodology as described in footnote 4 of *Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1582 n. 4 (Fed.Cir.1993). *Id.* Following this methodology, Commerce sought to add the amount of the foreign tax, rather than apply the foreign tax rate, in calculating the adjustment needed to account for the VAT. *Id.* at 3. As a consequence of this change, Commerce also recalculated the cash deposit rate.

Subsection 1673b(d)(2) provides that Commerce:

> shall order the posting of a cash deposit ... equal to the estimated average amount

by which the foreign market value exceeds the United States price. . . .

19 U.S.C. § 1673b(d)(2) (1988); *see also* 19 U.S.C. § 1673e(b) (1988) (applying similar calculation for final determination). In determining the absolute dumping margin pursuant to 19 C.F.R. § 353.2(f)(1), Commerce compared the FMV with the USP. *Second Remand Determination* at 10. Commerce then calculated the weighted average dumping margin, which serves as the cash deposit rate, by dividing "the aggregate dumping margins by the aggregated United States prices" pursuant to 19 C.F.R. § 353.2(f)(2) (1993). *Id.* at 10–11. Commerce's regulations interpret the term "United States price," as used in subsection (f), as the price *after* Commerce has made all adjustments as provided for by law. *See* 19 C.F.R. § 353.41(d)(iii) (1993) (defining USP as post-adjustment Exporter Sales Price and Purchase Price).

■ Domestic Producers contest Commerce's recalculation of the VAT adjustment pursuant to the tax-neutral methodology described in footnote 4 of *Zenith Electronics*. Domestic producers claim this methodology only provides partial tax neutrality because it understates the amount of cash deposits on future entries of the subject merchandise. In making this argument, Domestic Producers compare two calculations of the cash deposit rate distinguished by whether they include VAT.

Domestic Producers contend that if a 20 percent VAT is applied to the FMV, Commerce's methodology would ensure a tax-neutral result for the absolute dumping margin (the amount the FMV exceeds the USP), but an understated margin for the cash deposit rate applied to future imports. The reason for this discrepancy, according to Domestic Producers, is that although the difference between the new FMV and the new USP remains the same (because, pursuant to *Federal–Mogul,* Commerce adds the same amount of the tax to both the FMV and the USP), the denominator, the new USP which would now include the added VAT, would be larger and, therefore, would reduce the overall cash deposit rate for future imports. As a result, Domestic Producers argue, Customs will consistently undercollect estimated duties.[1] (*Domestic Steel Producers Comments on the Second Remand Redetermination of the Department of Commerce at 3.*)

Domestic Producers contend such underpayment would violate the statutory directive underlying duty calculation to produce reasonably correct duty deposit rates, as mandated by the Court of Appeals for the Federal Circuit in *Torrington Co. v. United States,* 44 F.3d 1572, 1578–79 (Fed.Cir.1995). Domestic Producers claim that *Torrington* found (in the context of an administrative review, rather than an initial duty determination as here) that title 19 does not require the same method of calculation for cash deposit rates as for duty assessments, so long as the methodology does not result in the consistent underpayment of estimated duties. *Torrington,* 44 F.3d at 1579. Domestic Producers assert that because Commerce's present methodology results in the systematic and consistent undercalculation of duty deposit rates, Commerce is obligated to adjust the rates to reflect existing dumping margins accurately.

The court disagrees. Commerce's methodology does not underrepresent duty deposit

---

1. For example, when a company is dumping goods in the United States for $100, and selling goods in the foreign market for $120, the absolute dumping margin for duty assessment is $20 ($120 − $100 = $20). The *ad valorem* cash deposit rate for future imports would be 20 percent ($20/$100 = 20%).

  If a 20 percent VAT is applied to the home market sale (20% of the FMV of $120 = $24) and to the USP, using the same figures, the difference between the new FMV of $144 ($120 + $24 = $144) and the new USP of $124 ($100 + $24 = $124), would give the same absolute dumping margin of $20 for purposes of Hoogovens' duty assessment ($144 − $124 = $20). However, the addition of the VAT reduces the *ad valorem* cash deposit rate. When the absolute dumping margin of $20 is divided by the new USP of $124, the *ad valorem* rate becomes 16 percent ($20/$124 = 16%). Although Domestic Producer's reasoning is seductive, it is premised on the notion that the two calculations are comparable and must result in the same outcome. They are not, for the reasons discussed *infra*.

rates. The statute mandates that the cash deposit rate used for future imports must be equal to the absolute dumping margin, however, it does not establish precisely how that margin should be calculated. The two calculations both result in cash deposit rates which equal the absolute dumping margin. Although the results of the calculations differ because of the addition of VAT, this discrepancy follows from the use of different data; the relationship between the cash deposit rates and the absolute dumping margins, nonetheless, remains the same.

Commerce bases the cash deposit rate upon the "estimated average amount by which the foreign market value exceeds the United States price." 19 U.S.C. § 1673b(d)(2). The estimated average amount is dependent upon how "foreign market value" and "United States price" are calculated. For example, when the VAT is added to the FMV and the USP, the difference between the FMV and the USP remains the same (this difference constitutes the absolute dumping margin applied to Hoogovens), but the margin is smaller proportionally in relation to a larger USP.[2] This calculation does not defeat the statute's mandate. Section 1673b only requires the cash deposit rate to equal the absolute margin's proportion of the USP, not that the cash deposit rate equal the proportion of a USP figure *which does not include VAT*. *Id.* Commerce has met this goal.

■ The statute has not defined what constitutes the USP or the absolute dumping margin used for the assessment. The court does not find that "Congress has directly spoken to the precise question at issue."

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Rather, Congress has left to the agency "the choice of a course to follow in pursuit of a Congressional purpose, embodied in a statute, and the agency has issued regulations or taken other considered and official action, declaring that course." *Federal–Mogul*, 63 F.3d at 1579. This court must defer to Commerce's interpretation of the statute, provided that Commerce makes a permissible construction of the statute. *Id.* The court finds Commerce's interpretation reasonable and has been supported by the Federal Circuit.

In *Torrington*, the Federal Circuit found, in the annual review context[3], that "[t]itle 19 requires only cash deposit estimates, not absolute accuracy [and that such] estimates need only be reasonably correct pending the submission of complete information." *Torrington*, 44 F.3d at 1579. The Federal Circuit found that there is no guarantee that one particular methodology would necessarily result in "a more accurate estimation of future duties than reliance on total United States price." *Id.* Rather, the court reasoned that "United States price" would be "subject to both upward and downward adjustment, depending on many factors" and could change between administrative reviews. *Id.* Thus, Commerce "cannot predict whether use of the entered value for any given review period would produce a more accurate cash deposit rate." *Id.*

Similarly here, the calculations in Commerce's estimate may change between the initial determination and a subsequent administrative review. Such calculations mere-

---

**2.** Using the previous example, the $20 absolute difference would make up a smaller proportion of the USP, as the USP would include the added $24 VAT amount ($20/$124 rather than $20/$100).

**3.** Calculation of cash deposit rates and assessment rates during an administrative review involves a similar statute, 19 U.S.C. § 1675(a)(2) (1988), to the one involved in this case. Subsection 1675(a)(2) provides:

[T]he administering authority shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and
(B) the amount, if any, by which the foreign market value of each entry exceeds the United States price of the entry.

Th[is] determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

ly serve as an approximation until an administrative review is requested. As such, the inherent imprecision of estimating future cash deposit rates would grant Commerce substantial discretion. Further, *Federal–Mogul* presents Commerce "with a choice between methodologies for calculating dumping margins that are tax-neutral, on the one hand, and methodologies that are not tax-neutral, on the other." *Federal–Mogul,* 63 F.3d at 1581. In light of the considerable discretion that subsection 1673b(d)(2), *Torrington,* and *Federal–Mogul* have given Commerce, and in the absence of a conflict between the statutory mandates and Commerce's regulations, the court sustains Commerce's methodology for calculating the cash deposit rate.

## CONCLUSION

The court finds Commerce's selected highest non-aberrant margin as BIA for Hoogovens' unreported ESP data sufficiently adverse to meet the requirements of the BIA rule, indicative of Hoogovens' sales and customary selling practices, and supported by substantial evidence on the record.

Further, in light of Commerce's considerable discretion, and, in the absence of a conflict between the statutory mandates and Commerce's regulations, the court sustains Commerce's methodology for calculating the cash deposit rate. Accordingly, Commerce's second remand redetermination is sustained.

## ORDER

This action having been submitted for decision, and upon due deliberation, it is hereby

ORDERED Commerce's Redetermination on Reremand is sustained; and it is further

ORDERED this action is dismissed.