THE AD HOC COMMITTEE OF FLORI-
DA PRODUCERS OF GRAY PORT-
LAND CEMENT, Plaintiff,

v.

UNITED STATES, Defendant,

and

Cementos Caribe, C.A., and Corporación
Venezolana de Cementos, S.A.C.A.,
Defendant–Intervenors.

Slip Op. 98–131.
Court No. 93–02–00102.

United States Court of
International Trade.

Sept. 11, 1998.

DiscoVision failed to present evidence.  (D.I. 617      at 69–70) The court disagrees.

**354**

King & Spalding, (Joseph W. Dorn, Michael P. Mabile, Michael Diehl, and Susan P. Quarngesser), Washington, DC, for Plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice; Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (Lucius B. Lau), of counsel, Washington, DC, for Defendant.

Thompson Coburn (Andrew Jaxa–Debicki), Washington, DC, for Defendant–iIntervenor Cementos Caribe, C.A.

Shearman & Sterling (Thomas B. Wilner, Stephen J. Marzan, Jeffrey M. Winton, Reginald R. Goeke), Washington, DC, for Defendant–Intervenor, Corporación Venezolana de Cementos, S.A.C.A.

### OPINION

GOLDBERG, District Judge.

Plaintiff, the Ad Hoc Committee of Florida Producers of Gray Portland Cement ("Ad Hoc"), challenges certain aspects of quarterly foreign market value ("FMV") calculations made by the U.S. Department of Commerce, International Trade Administration ("Commerce"), pursuant to an agreement to suspend an antidumping investigation of gray portland cement and cement clinker from Venezuela. Specifically, plaintiff points to the following three errors in the quarterly FMV calculations: (1) Commerce erroneously based constructed value ("CV") on export cement, rather than on home market comparison merchandise; (2) Commerce erroneously directed respondents to capitalize and amortize major maintenance expenses; and (3) Commerce erroneously allowed a circumstance of sale adjustment for technical service expenses.

Commerce first responds that plaintiff's entire suit should be rejected as moot. In the alternative, Commerce defends its quarterly FMV calculations as to plaintiff's first two allegations, yet concedes that it erred with respect to the COS adjustment. Defendant-intervenor, Cementos–Caribe, C.A. ("Caribe"), maintains that Commerce correctly allowed the COS adjustment.

The Court concludes that this suit should not be dismissed on mootness grounds. The Court, however, rejects all three of plaintiff's challenges to the FMV calculations. Accordingly, plaintiff's motion for judgment on the agency record is denied.

### I.

### BACKGROUND

This case revolves around two quarterly FMV calculations issued by Commerce on September 21, 1992 and December 20, 1992, in accordance with an agreement to suspend an antidumping investigation of gray portland cement and cement clinker from Venezuela.[1] *See Notice of Suspension of Investi-*

---

1. The administrative proceedings at issue, *i.e.,* the two quarterly FMV calculations, were conducted prior to January 1, 1995. Consequently, the applicable law in this case is the antidumping statute as it existed prior to the amendments made by the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994). *See Torrington Co. v. United States,* —

*gation: Gray Portland Cement and Clinker from Venezuela,* 57 Fed.Reg. 6706 (1992) (*"Notice of Suspension Agreement"*). The relevant facts informing the discussion are set forth below.

In response to a petition filed by Ad Hoc, Commerce initiated an antidumping investigation on June 14, 1991 to determine whether Venezuelan producers of gray portland cement were making sales in the United States at less than fair value. *See Notice of Initiation of Antidumping Duty Investigation: Gray Portland Cement and Clinker from Venezuela,* 56 Fed.Reg. 27496 (1991). Commerce then published its preliminary affirmative determination of sales at less than fair value on November 4, 1991. *See Preliminary Determination of Sales at Less Than Fair Value: Gray Portland Cement and Clinker from Venezuela,* 56 Fed.Reg. 56390 (1991) (*"Preliminary Determination"*). Significantly, in the *Preliminary Determination* Commerce based FMV for respondent Corporación Venezolana de Cementos S.A.C.A. ("Vencemos") on home market and third country sales. *Id.* at 56392. Before completing the final phase of the investigation, however, Commerce and the Venezuelan respondents, Caribe and Vencemos, entered an agreement to suspend the investigation pursuant to 19 U.S.C. § 1673c(b)(2) (1988). *See Notice of Suspension Agreement.*

The purpose of the agreement at issue, as with any suspension agreement, is to ensure that respondents revise their prices to eliminate sales of subject merchandise to the United States at less than fair value. *See* 19 U.S.C. § 1673c(b) (1988). Towards this end, this particular suspension agreement requires Commerce, unlike in the *Preliminary Determination,* to calculate FMV based on the constructed value of the merchandise, as defined in 19 U.S.C. § 1677b(e). *See Notice of Suspension Agreement,* 57 Fed.Reg. at 6708. The suspension agreement requires Caribe and Vencemos to submit constructed value data to Commerce on a quarterly basis and in a format prescribed by Commerce.

*Id.* (¶ D). Commerce then uses this quarterly cost data to calculate quarterly FMVs for each signatory respondent. The quarterly FMVs for each calendar quarter then serve as respondents' benchmark sale prices in the next quarter, *i.e.,* the prices at or above which respondents must make sales of subject merchandise to the United States during the subsequent quarter. *Id.* at 6707–08(¶ C). The suspension agreement also allows the interested domestic parties access to the submitted data as well as to the results and methodologies employed by Commerce. *Id.* at 6708(¶ E). In addition, all interested parties may submit written comments upon the release of the quarterly FMV calculation and, once during each year, the parties may request a hearing on issues raised during the course of the proceedings. *Id.*

In the underlying administrative proceeding, plaintiff objected to numerous aspects of both the September 21, 1992 and the December 20, 1992 FMV calculations,[2] including the three issues raised in this case. The genesis of these objections is as follows. On August 31, 1992, Vencemos and Caribe submitted their CV data for the April 1, 1992 to June 30, 1992 quarter. In accordance with the suspension agreement, Commerce was to make its September 20, 1992 FMV calculations from this data and, thereby, set the benchmark prices for the following quarter. *See Notice of Suspension,* 57 Fed.Reg. at 6707–08 (¶¶ C–4 and D). On September 8, 1992, Ad Hoc submitted comments to Commerce concerning respondents' August 31, 1992 responses. In relevant part, Ad Hoc complained that (1) Vencemos improperly reported cost data solely for "export quality" ES–40 cement produced at its Pertigalete II plant (*i.e.,* its most modern plant), rather than weight-averaging cost data for home market cement produced at all of its plants; (2) Vencemos erroneously amortized major maintenance costs associated with the shutdown of production facilities over the succeeding twelve months, rather than expens-

---

Fed. Cir. (T) ——, ——, 68 F.3d 1347, 1352 (1995).

**2.** Paragraph C.4 of the Suspension Agreement provides that the quarterly FMV calculations

shall be made "not later than September 20, December 20, March 20, and June 20 of each year." *Notice of Suspension,* 57 Fed.Reg. at 6707.

ing them in the year in which they were incurred; and (3) Caribe improperly treated its technical service expense as a direct home market selling expense, instead of an indirect selling expense. *See* Letter from Joseph W. Dorn, Counsel for Ad Hoc, to Barbara H. Franklin, Secretary of Commerce, Transmitting Comments on Vencemos' Aug. 31, 1992 Questionnaire Response 1–11 (Sept. 8, 1992); Letter from Joseph W. Dorn, Counsel for Ad Hoc, to Barbara H. Franklin, Secretary of Commerce, Transmitting Comments on Caribe's Aug. 31, 1992 Questionnaire Response 10 (Sept. 8, 1992). Notwithstanding these critiques, Commerce issued quarterly FMV calculations on September 21, 1992, without revising any of the alleged errors noted by Ad Hoc.

Similarly, on November 2, 1992, Vencemos and Caribe submitted their CV data for the July 1, 1992 to September 30, 1992 quarter. Ad Hoc submitted comments to Commerce on November 9, 1992, containing substantially the same objections raised with respect to respondents' August 31, 1992 responses. *See* Letter from Joseph W. Dorn, Counsel for Ad Hoc, to Barbara H. Franklin, Secretary of Commerce, Transmitting Comments on Vencemos' Nov. 2, 1992 Questionnaire Response 1–4 (Nov. 9, 1992); Letter from Joseph W. Dorn, Counsel for Ad Hoc, to Barbara H. Franklin, Secretary of Commerce, Transmitting Comments on Caribe's Nov. 2, 1992 Questionnaire Response 7 (Nov. 9, 1992). Again, when it issued the December 20, 1997 FMV calculations, Commerce did not account for the alleged errors noted by Ad Hoc. Thereafter, on February 17, 1993, Ad Hoc initiated this suit to contest Commerce's action during the course of the suspension agreement proceedings.

Before the court could rule on the merits of plaintiff's case, however, Commerce filed a motion to dismiss for lack of subject-matter jurisdiction. In particular, Commerce argued that the quarterly FMV calculations were not final agency decisions, but rather interim decisions, which could be considered as part of an administrative review(s) pursuant to 19 U.S.C. § 1675(a)(1)(C) (1988). As a result, Commerce maintained that plaintiff's case is premature, and therefore, the court lacks jurisdiction to review the case.

The court rejected Commerce's motion to dismiss for lack of jurisdiction, holding that the court could consider the case under its residual jurisdiction authority, 28 U.S.C. § 1581(i). *See Ad Hoc Comm. of Florida Producers of Gray Portland Cement v. United States,* 18 CIT 1001, 1007, 866 F.Supp. 576, 581 (1994) (*"Ad Hoc I "*). To reach this holding, the court reasoned that (1) review of the quarterly FMV calculations is not provided for under other subsections of section 1581, and (2) even if review under another subsection were available, it would be manifestly inadequate. 18 CIT at 1005–07, 866 F.Supp. at 579–81. Accordingly, the court determined that it was appropriate to exercise its residual jurisdiction under section 1581(i).

On June 4, 1997, this case was reassigned from Senior Judge Musgrave to Judge Goldberg. Against this backdrop, the Court now considers whether judgment on the agency record should be granted in plaintiff's favor.

## II.

### DISCUSSION

This case requires the Court to review certain aspects of two quarterly FMV calculations made pursuant to a suspension agreement. In this section, the Court first reconsiders the jurisdictional basis for this suit and, with some reservation, continues to exercise jurisdiction under section 1581(i). The Court then considers defendant's argument that this suit should be rejected on mootness grounds. After finding this argument unpersuasive, the Court turns to the merits of the case. In doing so, the Court first sets out the standard of review with which it reviews the quarterly FMV calculations. Then, the Court examines each of plaintiff's three challenges to the FMV calculations in turn and concludes that in all instances, Commerce's calculations should be upheld.

**A. *Preliminary Matters: Jurisdiction & Mootness***

**i. Jurisdiction**

■ Notwithstanding the earlier jurisdictional opinion in *Ad Hoc I,* once the case was

reassigned to this Court, it became incumbent upon the Court to review the jurisdictional basis of the case. *See Martin By Martin v. Secretary of Health and Human Services*, 62 F.3d 1403, 1406 (Fed.Cir.1995) (stating that "[e]very federal court has the responsibility to determine whether it ... has jurisdiction"); *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.1993) (noting that "[a] party, or the court sua sponte, may address a challenge to subject matter jurisdiction at any time, even on appeal"). For the reasons that follow, the Court respectfully cannot endorse the jurisdictional opinion of its learned brethren in *Ad Hoc I*. Yet, in view of the lengthy interval between the start of this case and today, the Court continues to invoke jurisdiction under section 1581(i) to reach the merits of this case. Given the divergent opinions on this issue, ultimate resolution of the jurisdictional question is best left for appellate review.

■ It is well established that the residual jurisdiction of the court under section 1581(i) "may not be invoked when jurisdiction under another subsection of § 1581 *is or could have been available*, unless the relief provided under that other subsection would be manifestly inadequate." *Norcal/Crosetti Foods, Inc. v. United States*, 10 Fed. Cir. (T) 61, 64, 963 F.2d 356, 359 (1992) (quoting *Miller & Co. v. United States*, 5 Fed. Cir. (T) 122, 124, 824 F.2d 961, 963 (1987)). Contrary to the finding of the court in *Ad Hoc I*, in this Court's view there is a remedy available under another subsection of section 1581, and this remedy is not inadequate.

First, Congress expressly mandated a procedure for the review of suspension agreement proceedings. The antidumping statute requires Commerce to initiate an administrative review of a suspension agreement upon the request of an interested party. *See* 19 U.S.C. § 1675(a). Specifically, 19 U.S.C. § 1675(a)(1)(C) provides that Commerce shall "review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and

review the amount of any subsidy or margin of sales at less than fair value involved in the agreement." In turn, a party may seek judicial review of such determination pursuant to 28 U.S.C. § 1581(c), as provided in 19 U.S.C. § 1516a(a)(2)(B)(iii) (permitting judicial review of determinations made under 19 U.S.C. § 1675). Accordingly, it could not be more plain that Congress mandated a scheme for the review of suspension agreements. And, in this scheme, this court's jurisdiction to review suspension agreements flows from subsection 1581(c). And importantly, when it defined the scope of this court's jurisdiction as part of the Customs Court Act of 1980, the House Judiciary Committee explicitly stated that "it is the intent of the Committee that the Court of International Trade not permit [28 U.S.C. § 1581(i) ] ... to be utilized to circumvent the exclusive method of judicial review of those antidumping ... determinations listed in [19 U.S.C. § 1516a]," which includes administrative review determinations of suspension agreements. H.R.Rep. No. 1235, 96th Cong., 2d Sess. 48 (1979), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3759–60. Thus, because in this Court's view subsection 1581(c) serves as the jurisdictional basis for review of suspension agreement proceedings, the invocation of subsection 1581(i) jurisdiction is only appropriate if the relief available under subsection 1581(c) is manifestly inadequate.

■ In this instance, the Court sees no reason why the relief potentially available under subsection 1581(c) would have been manifestly inadequate.[3] Through this action, plaintiff asks the Court to issue an order requiring Commerce to engage in specific conduct for the remainder of this suspension agreement proceeding. Yet, this prospective relief that plaintiff seeks could instead be secured through an administrative review of the suspension agreement as provided for in 19 U.S.C. § 1675(a)(1)(C). Prospective relief is available through administrative review of a suspension agreement for one simple reason: liquidation of subject merchandise en-

---

3. It is unsurprising that two reasonable minds differ as to whether relief afforded under section 1581(c) is manifestly inadequate. This is because Congress and the courts have left "largely

undefined [the] standard of manifest inadequacy." *Hylsa, S.A. de C.V. v. United States*, 21 CIT ——, ——, 960 F.Supp. 320, 324 (1997).

tered during the course of a suspended investigation is not suspended. *See* 19 U.S.C. § 1673c(f)(2)(A) (1988). Because liquidation of these entries is not suspended, an administrative review of a suspension agreement only affords Commerce the opportunity to consider methodological and procedural changes for administering the remainder of the suspension agreement. Thus, unlike an administrative review of an antidumping duty determination, which principally serves a retrospective function (*i.e.*, by calculating the actual assessment rate for suspended entries), an administrative review of a suspension agreement effectively offers prospective relief.[4] *See Floral Trade Council v. United States*, 21 CIT ——, ——, 991 F.Supp. 655, 663 (1997) (noting that "[s]uspension agreements are inherently forward looking").

Also, the *Ad Hoc I* court based its decision in part on the mistaken belief that an administrative review of the contested agreement could not delve into the CV methodology employed during the suspension proceedings. It reasoned that because Commerce based FMV on home market and third country sales during its preliminary determination, an administrative review of FMV calculations made as part of the suspension agreement would be limited to review of home market and third country sales data. *See Ad Hoc I*, 18 CIT at 1005–06, 866 F.Supp. at 580.

■ Support for this notion, however, is lacking. Nowhere does the statute so severely narrow the scope of administrative reviews of suspension agreements to methodologies employed in the preliminary determination of the underlying investigation. Indeed, 19 U.S.C. § 1675(a)(1)(C), as well as Commerce's interpretation of this statute, *i.e.*, 19 C.F.R. § 353.22(c)(7)(iii) (1992), makes clear that "the current status of, and compliance with" the suspension agreement, not any aspect of a preliminary determination, is the subject matter of a suspension agreement administrative review. *See also* 19

C.F.R. §§ 353.22(c)(6) and (9) (providing that Commerce shall disclose to the interested parties an explanation of the calculation methodology used in the results). And, this plainly allows that methodologies employed in the suspension agreement proceeding may be scrutinized during an administrative review of a suspension agreement. Hence, the CV methodology used in the two quarterly FMV calculations could have been challenged through an administrative review of the suspension agreement and then, if necessary, in this court pursuant to subsection 1581(c). As such, the relief afforded under subsection 1581(c) is adequate.

■ Finally, the jurisprudence of this court clearly suggests that a court may exercise its residual jurisdiction under subsection 1581(i) when the "legality" of the administrative proceeding is at issue. *See Carnation Enterprises Pvt. Ltd. v. United States*, 13 CIT 604, 612, 719 F.Supp. 1084, 1091 (1989) (asserting section 1581(i) jurisdiction to contest the legality of an antidumping order and the resulting administrative reviews); *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 584, 586–88, 717 F.Supp. 847, 850–51 (1989) (asserting section 1581(i) jurisdiction to review an allegedly unlawful administrative review). But when, as here, an action concerns a challenge to a particular decision or methodology employed by the agency, the court has consistently declined to invoke section 1581(i) jurisdiction. *See, e.g., MacMillan Bloedel Ltd. v. United States*, 16 CIT 331, 332–33 (1992) (declining to invoke section 1581(i) jurisdiction when plaintiff challenged Commerce's decision to deny its exclusion request); *Koyo Seiko Co. v. United States*, 13 CIT 461, 464, 715 F.Supp. 1097, 1100 (1989) (finding no section 1581(i) jurisdiction to review an agency decision denying additional period of time to comment). This case presents a challenge to certain methodologies employed by Commerce in the process of making quarterly

---

4. The Court is sympathetic to plaintiff's argument that the administrative review of the suspension agreement may not provide the most expeditious relief. Yet, simply because an administrative review may take longer, it does not follow that the relief afforded thereunder is not meaningful. If plaintiff has a concern about the efficiency of an administrative review, it may petition the court. *See Nakajima All Co. v. United States*, 12 CIT 585, 592, 691 F.Supp. 358, 364 (1988) (ordering Commerce to complete an administrative review that had been inordinately delayed).

FMV calculations; it does not contest the legality of Commerce's authority to make such quarterly determinations. As such, in this Court's view, the exercise of subsection 1581(i) jurisdiction is inappropriate. Notwithstanding this analysis, the Court recognizes that the jurisdictional question at hand is not well settled. In view of this and in view of the lengthy interval between the start of this case and today, the Court deems it appropriate in this instance to refrain from disrupting the earlier jurisdictional opinion in order to reach the merits of the case. Consequently, the Court continues to exercise jurisdiction pursuant to 28 U.S.C. § 1581(i).

### ii. Mootness

It is well established that "[a] court with jurisdiction under Article III of the Constitution will not decide cases that are moot because of an absence of 'subject matter on which the judgment of the court can operate.'" *Torrington Co. v. United States,* —— Fed. Cir. (T) ——, ——, 44 F.3d 1572, 1577 (1995) (quoting *Ex Parte Baez,* 177 U.S. 378, 390, 20 S.Ct. 673, 44 L.Ed. 813 (1900)).

Commerce argues that this case is moot. Commerce points out that the two challenged FMV calculations are no longer in effect (*i.e.,* the September 21, 1992 FMV calculation only affected sales of subject merchandise to the United States for the last quarter of 1992, and the December 20, 1992 FMV calculation only affected sales of subject merchandise to the United States during the first quarter of 1993). Because the challenged FMV calculations no longer hold any administrative significance, Commerce maintains the case is moot. Commerce further notes that the only record before the Court pertains to the September 21, 1992 and the December 20, 1992 administrative proceedings. Commerce points out that the administrative record of other, subsequent quarterly FMV calculations is not before the Court. Commerce therefore asserts that because the case is moot, it should be dismissed. The Court agrees in part. For the reasons stated above, plaintiff's claim is technically moot.

■ This, however, does not dispose of the case. Commerce overlooks an important exception to the mootness doctrine that exists when an issue is "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). *See also Torrington,* —— Fed. Cir. (T) at ——, 44 F.3d at 1577; *NSK Ltd. v. United States,* 17 CIT 251, 253, 819 F.Supp. 1096, 1098 (1993). Two conditions must be satisfied to qualify for the exception. First, the challenged action must have been too short in duration "to be fully litigated prior to its cessation or expiration." *Cambridge Lee Indus., Inc. v. United States,* 9 Fed. Cir. (T) 28, 32, 916 F.2d 1578, 1581 (1990) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)). Second, there must be "a 'reasonable likelihood' that the party 'will again suffer the [injury] that gave rise to the suit.'" *Cambridge,* 9 Fed. Cir. (T) at 32, 916 F.2d at 1581 (quoting *Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). In those instances where a plaintiff qualifies for the "capable of repetition, yet evading review" exception, the case is not considered moot. *See Torrington,* —— Fed. Cir. (T) at ——, 44 F.3d at 1577.

■ Plaintiff's case satisfies both required elements of the "capable of repetition" exception to the mootness doctrine. First, the underlying administrative actions were too short in duration to be fully litigated before the administrative proceedings expired. That is, each quarterly FMV calculation at issue was only in effect for the following quarter. A three month period is plainly too short for this type of case to be fully litigated. Second, there is a "reasonable likelihood," indeed, there is a strong likelihood, that plaintiff might again suffer the harm alleged in its complaint. Plaintiff challenges certain aspects of the FMV calculations that continue to impact how Commerce administers the suspension agreement. That is, the suspension agreement is an ongoing administrative proceeding,[5] in which Commerce may

---

5. A review of available sources establishes that the suspension agreement at issue is still in effect. *See Suspension Agreement: Cement and Ce-*

*ment Clinker from Venezuela, Opportunity to Request Review,* 63 Fed.Reg. 5929 (Feb. 5, 1998) (providing opportunity to request review of sus-

apply substantially the same methodology(ies) in each successive quarter. And, unless addressed by this Court, the alleged harm could continue unabated through the remainder of the suspension agreement. It is therefore apparent that the issues involved in this case are capable of repetition. Accordingly, the Court finds this case falls within the "capable of repetition, yet evading review" exception to the mootness doctrine, and the Court is at liberty to render a decision on the issues in this case.

## B. Standard of Review

■ As noted above in Section II.A, the challenged FMV calculations are not determinations explicitly subject to review pursuant to 19 U.S.C. § 1516a(a). *See also Ad Hoc I,* 18 CIT at 1005, 866 F.Supp. at 579. As a result, the standard of review that typically governs the court's review of Commerce determinations, *i.e.,* the standard set forth in 19 U.S.C. § 1516a(b), is not directly applicable. Nevertheless, the Court adopts this standard to review the challenged FMV calculations because it presents the most appropriate standard to review a decision on the agency record. Therefore, the Court will sustain the FMV calculations at issue here unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

■ To determine whether Commerce's interpretation is in accordance with law, the court applies the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* first directs the court "to determine whether Congress has directly spoken to the precise question at issue." *Id.* at 842–43, 104 S.Ct. 2778 (internal quotations and citations omitted). If the statute is unambiguous as to the issue at hand, then the court must give effect to the intent of Congress. *Id.* However, "[i]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is

based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnote omitted). Thus, the second element of the *Chevron* test directs the court to consider the reasonableness of an agency's interpretation.

■ When asked to review Commerce's factual findings, the court will uphold the agency if its findings are supported by substantial evidence. "Substantial evidence is something more than a 'mere scintilla,' and must be enough to reasonably support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

## C. The Merits of Plaintiff's Case

### i. Commerce's Decision to Base CV on Export Merchandise

■ The Court now turns to the merits of plaintiff's case. Ad Hoc first contends that Commerce erred when it decided to base CV for respondent Vencemos on export merchandise. Ad Hoc maintains that 19 U.S.C. § 1677b(e) requires CV to be based on *home market* comparison merchandise, not *export* merchandise. In this case, the distinction is important because Vencemos produced the "ES–40" export cement only at its most modern, cost-efficient plant. Vencemos did not produce "ES–40" export cement at its three other, older plants. As a result, the quarterly FMV calculations were different than what they would have been if Commerce had derived them from constructed value of cement produced at all four plants. The Court finds that Commerce's decision to calculate CV using Vencemos' "ES–40" export cement was based on a reasonable interpretation of the statute and was supported by substantial evidence. Accordingly, the Court sustains Commerce's FMV calculations in this respect.

The statutory definition of "constructed value" is set forth in Section 773(e) of the Tariff Act of 1930, which provides in relevant part as follows:

pension agreement for the period covering February 1, 1997 to January 31, 1998). *See also AD and CVD Investigations* (visited Sept. 10, 1998)

<http://www.ita.doc.gov/import_admin/records/stats/susp.html> (showing that the suspension agreement at issue is currently in effect).

For purposes of this subtitle, the constructed value of imported merchandise shall be the sum of

(A) the cost of materials ... and of fabrication or other processing of any kind employed in producing *such or similar* merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business; ....

19 U.S.C. § 1677b(e)(1) (1988) (emphasis added). This provision requires, as all parties agree, Commerce to base CV on the cost of manufacture of "such or similar merchandise." As a result, an analysis of the statutory definition for the term "such or similar merchandise" is critical to settle the CV issue Ad Hoc raises.

Section 771(16) of the Tariff Act of 1930 sets forth a hierarchy for ascertaining "such or similar merchandise." *See* 19 U.S.C. § 1677(16). Importantly, section 771(16) reads,

The term "such or similar merchandise" means merchandise in the *first* of the following categories in respect of which a determination for the purposes of [the antidumping statute] can be satisfactorily made:

(A) The *merchandise which is the subject of an investigation* and *other merchandise which is identical in physical characteristics with,* and was produced in the same country by the same person as, that merchandise.

(B) Merchandise –

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation, ...

(C) Merchandise

(i) produced in the same country and by the same person and of the same general class or kind of merchandise which is the subject of the investigation, ....

19 U.S.C. § 1677(16) (1988) (emphasis added).

From this language, it is clear that Commerce must first determine whether there is "such" (*i.e.,* identical) merchandise within the meaning of 19 U.S.C. § 1677(16)(A). Commerce is allowed to consider "similar" merchandise, as defined in subsections (B) and (C), only if a determination cannot be made with respect to the merchandise described in subsection (A). In parsing subsection (A) of section 771(16), it is also apparent that two types of merchandise are to be considered as "such" or "identical" merchandise: (1) "the merchandise which is the subject of an investigation"; and (2) "other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise." 19 U.S.C. § 1677(16)(A).

Defendant-intervenor, Vencemos, contends that this language by its plain terms requires Commerce to consider whether merchandise exported to the United States is available and, if available, Commerce must derive CV from this merchandise. In other words, Vencemos maintains that "the merchandise which is the subject of an investigation," can mean only one thing, merchandise that is exported to the United States. The Court is unwilling to place this mark of certainty upon the language of the statute. Indeed, while "merchandise which is the subject of the investigation" may be read to mean the merchandise that is actually imported to the United States, it also may be read to comprise all relevant merchandise under investigation irrespective of whether or not it is shipped to the United States. And, subsection (A) also explicitly provides that "identical" merchandise produced in the home market may be used as "such" merchandise. As a result, it cannot be said that the statute expressly requires Commerce to derive CV solely from subject merchandise exported to the United States. Therefore, it is necessary to proceed to *Chevron* step two and determine if Commerce's decision to base CV on Vencemos' export merchandise was reasonable.

The Court finds that Commerce's decision to base CV on export merchandise was reasonable. As discussed above, the plain language in subsection 771(16)(A) easily might

be interpreted such that merchandise exported to the United States is actually the "merchandise which is the subject of the investigation." And, contrary to plaintiff's argument, nowhere does the language in subsection 771(16) expressly limit the scope of "such or similar" merchandise to merchandise that is sold in the home market or a third country market. Moreover, section 1677b(e)(1), the constructed value provision, specifically refers to "the constructed value of the *imported* merchandise," thereby suggesting that it is reasonable to base CV on the costs of merchandise actually exported to the United States, not simply that sold in the home or third country market. 19 U.S.C. § 1677b(e)(1) (emphasis added).

Commerce's decision to base CV on export merchandise also reflects established practice on this issue.[6] *See Large Power Transformers from Italy: Preliminary Results of Antidumping Administrative Review*, 60 Fed.Reg. 51455, 51456 (Oct. 2, 1995) ("[W]e calculated foreign market value based on constructed value of the model sold in the United States.") (same methodology used in Final Results, *see* 61 Fed.Reg. 37443 (July 18, 1996)); *Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review*, 60 Fed.Reg. 50547, 50549 (Sept. 29, 1995) ("[W]e used the constructed value of the merchandise sold in the United States as the basis for FMV.") (same methodology used in Final Results, *see* 61 Fed.Reg. 35177 (July 5, 1996)); *Shop Towels from Bangladesh: Preliminary Results of Antidumping Duty Administrative Review*, 59 Fed.Reg. 66910, 66911 (Dec. 28, 1994) ("The CV includes the cost of materials and fabrication of the merchandise exported to the United States ....") (same methodology used in Final Results, *see* 60 Fed.Reg. 48966

(Sept. 21, 1995)); *see also* Import Administration Policy Bulletin No. 91/2, dated July 18, 1991, at 1 (affirming the continued use of export merchandise to calculate CV, and stating that "[t]he practice of both Treasury and Commerce for at least 60 years was to use the COM of the exported product").

Finally, Commerce's decision to base CV solely on export merchandise is consistent with the overall purpose of the antidumping statute—ensuring the most accurate measure to calculate dumping margins. That is, by basing CV on merchandise actually exported to the United States, Commerce is able to identify actual production costs, rather than more arbitrary comparisons. *See IPSCO, Inc. v. United States*, —— Fed. Cir. (T) ——, ——, 965 F.2d 1056, 1059 (1992). Based on the above, the Court concludes that it was entirely reasonable for Commerce to use only export "ES–40" cement to calculate CV for the quarterly FMV calculations.

### ii. Amortization of Maintenance Expenses.

As part of the quarterly questionnaires for the Suspension Agreement, Commerce directed respondents that "all costs incurred for major maintenance (maintenance requiring the shut down of the production facilities), ... should be capitalized and amortized over the succeeding twelve months." Letter from DOC/ITA Office of Agreements Compliance to Vencemos and Caribe Transmitting Antidumping Questionnaire 41 (Apr. 22, 1992). Both respondents complied with this request, and Commerce adopted this methodology to account for major maintenance costs when it calculated CV.

Plaintiff objects to this methodology. Plaintiff claims the methodology is inconsis-

---

**6.** The Court notes that in the post-URAA era, Commerce, when appropriate, continues to calculate CV based on the costs of merchandise exported to the United States. *See Certain Stainless Steel Butt–Weld Pipe Fittings from Taiwan: Preliminary Results of Antidumping Duty Administrative Review*, 63 Fed.Reg. 30710, 30713 (June 5, 1998) ("[W]e calculated CV based on the sum of the [cost of manufacturing] of the product sold in the United States."); *Shop Towels from Bangladesh: Preliminary Results of Antidumping Duty Administrative Review*, 61 Fed.Reg. 65025, 65026 (Dec. 10, 1996) ("We calculated CV, ..., as the sum of the cost of manufacturing (COM) of the product sold in the United States ....") (same methodology used in Final Results, *see* 62 Fed.Reg. 12600 (Mar. 17, 1997)); *Large Power Transformers from Italy: Preliminary Results of Antidumping Duty Administrative Review*, 61 Fed. Reg. 40815, 40816 (Aug. 6, 1996) ("[W]e calculated [normal value] based on the constructed value of the model sold in the United States.") (same methodology used in Final Results, *see* 62 Fed.Reg. 3661 (Jan. 24, 1997)).

tent with standard accounting practice, which requires maintenance costs to be expensed as incurred or amortized solely over the remainder of the fiscal year in which the expenses are incurred.[7]  According to plaintiff, only nonroutine major repairs that extend the life of the equipment should be amortized over a period longer than the fiscal year in which they are incurred.[8]  Plaintiff argues that in this case, the "major maintenance" costs reported by respondents were only for routine repairs, such as the replacement of grinding balls and refractory bricks.  Therefore, plaintiff maintains that the costs at issue should have been expensed, rather than amortized over the succeeding twelve months.

█  It is true that Commerce typically must follow generally accepted accounting principles ("GAAP") when it calculates cost of production and constructed value.  *See* H.R.Rep. No. 571, 93rd Cong., 1st Sess. 71 (1979) ("[I]n determining whether merchandise has been sold at less than cost, [Commerce] will employ accounting principles generally accepted in the home market of the country of exportation. . . ."). Yet, Commerce is not required to follow GAAP in all cases.  Importantly, when Commerce determines that an approach, whether consistent with GAAP or not, distorts costs, it may adopt an alternative methodology for calculating costs.  *Id.*  (stating that Commerce should use GAAP only "if [it] is satisfied that such principles reasonably reflect the variable and fixed costs of producing the merchandise").

█  In the underlying proceedings, Commerce specifically noted that requiring respondents to currently expense maintenance costs would distort CV.

Major maintenance costs, even if expensed in a quarter in which they are incurred, would be analyzed as part of the fiscal year costs for purposes of an administrative re-

view.  Because we are conducting quarterly reviews, expensing these costs in the quarter in which they are incurred could distort the constructed value calculation.  Therefore, major maintenance and repair costs should be amortized over the following 12–month period to preclude such distortions.

Memo. from R. Bolling, DOC/ITA Office of Compliance, Import Compliance Specialist, to the File 2 (Apr. 22, 1992).  Commerce thus maintains that its approach was reasonable because the immediate expensing of major maintenance costs would skew material costs, causing CV to rise and fall from quarter to quarter merely due to the timing of repair costs.

The Court agrees.  Commerce's approach is a reasonable means of avoiding distorted results in the context of quarterly FMV calculations.  Plaintiff offers an approach to expensing the major maintenance costs that assumes costs are being calculated for an entire fiscal year.  If Commerce were considering costs for an entire fiscal year, then there would be no distortion in expensing the costs of repairs during the year in which they were incurred.  Here, however, Commerce is required to calculate costs on a quarterly basis for the Suspension Agreement.  Since maintenance is performed on an annual basis, there will be some quarters in which there will be relatively limited maintenance costs, and others in which the costs will be extensive.  To avoid the distortion in the CV calculation that such fluctuating costs might engender, it was reasonable for Commerce to spread the costs over a twelve-month period.  Commerce's decision reflects its concern that the CV calculus should not be skewed simply by the timing of repair projects, but rather should reflect the closest approximation of actual costs.  Therefore, the Court concludes that Commerce's decision to deviate from

---

7.  *See* D. Kieso and J. Weygandt, *Intermediate Accounting* 509 (7th ed.  1992) ("Expenditures that do not increase an asset's future benefits should be expensed.  Ordinary repairs are expenditures that maintain the existing condition of the asset or restore it to normal operating efficiency and should be expensed immediately.").

8.  *Id.* ("[C]osts incurred to achieve greater future benefits should be capitalized, whereas expenditures that simply maintain a given level of services should be expensed.").

generally accepted accounting principles was reasonable.[9]

The Court also concludes that Commerce's decision to amortize major maintenance costs over a twelve month period was based on substantial evidence. The record establishes that the reported maintenance expenses at issue here were indeed major. In particular, the most important maintenance expense reported by respondents was the relining of the kiln. Relevant industry sources demonstrate that relining, an expensive undertaking that requires the facility's shutdown, is crucial to the longevity of the kiln, and that failure to reline could result in serious damage to the equipment. *See* K. Peray, *The Rotary Cement Kiln* 17, 19 (2d ed. 1986) ("In most instances, ..., damage [to the kiln] can be avoided if the kiln is shut down for lining replacement as soon as the shell starts to show a large red spot"; and "Replacement of the kiln lining, ..., is unfortunately a frequent necessity, exerting a large strain on the operating budget and on production schedules."). The record also indicates that respondents segregated their major maintenance costs from more minor, routine repair costs by reporting the former as those which necessitated a plant shutdown. The Court therefore finds that Commerce's decision to amortize the major maintenance expenses for each quarterly FMV calculation over the succeeding twelve-month period was based on substantial evidence.

### iii.   Circumstance of Sale Adjustment.

In its third and final argument, plaintiff claims that Commerce erred when it allowed Caribe a circumstance of sale ("COS") adjustment for direct selling expenses incurred when Caribe provided technical service to customers in the home market. Plaintiff objects to the treatment of the technical service expenses as direct selling expenses because it claims that Caribe failed to relate the expenses directly to sales of cement. Commerce also agrees that it erred in granting the COS adjustment; Commerce now claims that Caribe failed to demonstrate that it was entitled to a COS adjustment for technical services.

The antidumping statute provides that Commerce may grant a COS adjustment "if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ... other differences in circumstances of sale." 19 U.S.C. 1677b(a)(4)(B) (1988). Commerce's regulations further develop the requirements for this statutory adjustment:

> In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit such allowances to those that bear a direct relationship to the sales compared.

19 C.F.R. § 353.56(a)(1) (1993). Commerce has also established a two-step test to identify those expenses that bear a direct relationship to sales of subject merchandise: (1) Commerce determines if the claimed expenses are fixed or variable; and (2) if the expenses are variable, Commerce reviews them to determine if they can be reasonably attributed to the subject merchandise. *See, e.g., Calcium Aluminate Cement, Cement Clinker, and Flux from France: Final Determination of Sales at Less Than Fair Value*, 59 Fed.Reg. 14136, 14145 (Mar. 25, 1994).

■ The Court finds that Commerce's decision during the underlying administrative proceeding to grant Caribe's claimed COS adjustment was based on substantial evi-

---

**9.** The Court also notes that certain accounting authorities offer specific rules for calculating costs during shorter, interim periods. *See* Accounting Principles Board No. 289 ¶ 16a ("[W]hen a cost that is expensed for annual reporting purposes clearly benefits two or more interim periods (*e.g.*, annual major repairs), each interim period should be charged for an appropriate portion of the annual cost by the use of accruals or deferrals."). Although plaintiff claims this authority suggests that Commerce should have used an accrual or deferral methodology to account for major maintenance expenses, this argument was never raised during the underlying administrative proceeding and, hence, is inappropriate for review here. *See, e.g., Rhone Poulenc, Inc. v. United States*, 8 Fed. Cir. (T) 61, 68, 899 F.2d 1185, 1191 (1990).

dence. Importantly, both plaintiff and Commerce forget the context in which the decision to grant the COS adjustment was made. Commerce made the decision to grant the COS adjustment for the two FMV calculations at issue prior to conducting a verification of Caribe's submitted information. At this stage in the proceedings, Caribe had submitted a response, stating in relevant part that

> [t]he reported technical service expense is based on the expenses of the Company's customer assistance testing laboratory. This laboratory provides assistance to Caribe's customers in analyzing their application of products purchased from Caribe. The costs of personnel and equipment for this operation are dedicated entirely to this laboratory. The calculation of the ratio of home market technical service expense in 1991 to home market CGS for the period is shown in Exhibit 13 [showing that the ratio was calculated by dividing the total costs of Caribe's customer assistance testing laboratory by total cost of home market sales].

Caribe's Oct. 31, 1992, Response to Commerce's Questionnaire, at 52–53. At that point, prior to verification, Commerce was satisfied that the existing evidence entitled Caribe to a COS adjustment for technical service expenses. And, the evidence does suggest that the services provided by the testing laboratory were directly related to the subject merchandise. Given the context of the underlying proceedings, the Court is satisfied that, in this instance, the pre-verification evidence amounts to "substantial evidence" upon which Commerce could base its decision to grant a COS adjustment to direct selling expenses for technical services. The Court notes, however, that this evidence standing alone typically would not amount to substantial evidence in those instances where Commerce has developed a more complete record and has conducted a verification.

### III.

#### CONCLUSION

For the foregoing reasons, the Court finds that Commerce's quarterly FMV calculations should be sustained in all respects, and judgment will be entered accordingly.

#### JUDGMENT ORDER

Upon consideration of the motion submitted by plaintiff and the opposition thereto, upon all other papers submitted herein; upon due deliberation, and having rendered a decision herein; in conformity with said decision, it is hereby

**ORDERED, ADJUDGED and DE-CREED** that plaintiff's motion for judgment on the agency record is denied in all respects; and it is further

**ORDERED, ADJUDGED and DE-CREED** that Commerce's September 21, 1992 and December 20, 1992 FMV calculations made pursuant to the Agreement to Suspend the Antidumping Investigation of Gray Portland Cement and Cement Clinker from Venezuela, *See* 57 Fed. Reg. 6706 (1992), is hereby sustained in all respects.

**SO ORDERED.**