**Slip Op. 00-62**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                    :
KOYO SEIKO CO., LTD. and KOYO       :
CORPORATION of U.S.A.,              :
                                    :
        Plaintiffs,                 :
                                    :
        v.                          :    Court No. 99-01-00001
                                    :
UNITED STATES,                      :
                                    :
        Defendant,                  :
                                    :
        and                         :
                                    :
THE TIMKEN COMPANY,                 :
                                    :
        Defendant-Intervenor.       :
_____ :

    Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging a single aspect of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews</u>, 63 Fed. Reg. 63,860 (Nov. 17, 1998).

    Specifically, Koyo challenges Commerce's use of entered value to establish the assessment rate under 19 C.F.R. § 351.212(b) (1998).

    Commerce and defendant-intervenor, The Timken Company, respond that Commerce's use of entered value to calculate the assessment rate under 19 C.F.R. § 351.212(b) was proper and in accordance with law.

    **Held:** Koyo's motion is denied.


                                    Dated: June 1, 2000

Powell, Goldstein, Frazer & Murphy, LLP (Peter O. Suchman, Neil R. Ellis and Elizabeth C. Hafner) for plaintiffs.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michelle D. Lynch); of counsel: John F. Koeppen, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, William A. Fennell and Patrick J. McDonough) for defendant-intervenor.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging a single aspect of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 63 Fed. Reg. 63,860 (Nov. 17, 1998).

Specifically, Koyo challenges Commerce's use of entered value to establish the assessment rate under 19 C.F.R. § 351.212(b) (1998).

Commerce and defendant-intervenor, The Timken Company ("Timken"), respond that Commerce's use of entered value to calculate the assessment rate was proper and in accordance with law.

## BACKGROUND

This case concerns an administrative review of the antidumping duty order on tapered roller bearings and parts thereof imported from Japan during the review period of October 1, 1996 through September 30, 1997.[1]

Commerce reviewed and published the preliminary results on July 10, 1998. See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Preliminary Results of Antidumping Duty Administrative Reviews, 63 Fed. Reg. 37,344. On November 17, 1998, Commerce published the final review at issue here. See Final Results.

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995) ("URAA"). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

The review arose from two antidumping proceedings: the antidumping finding regarding tapered roller bearings, four inches or less in diameter ("0-4" TRBs"), and components thereof, from Japan, see Tapered Roller Bearings and Certain Components From Japan, 41 Fed. Reg. 34,974 (Aug. 18, 1976), and the antidumping duty order on tapered roller bearings ("over-4" TRBs") and parts thereof, finished and unfinished, from Japan. See Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan, 52 Fed. Reg. 37,352 (Oct. 6, 1987).

Although Commerce's notice of opportunity to request a review covered both antidumping proceedings, the antidumping finding concerning the 0-4" TRBs and the antidumping duty order concerning over-4" TRBs, Koyo only requested a review of the findings concerning 0-4" TRBs.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

This Court will uphold Commerce's final determination in an administrative review unless it is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B).

## I.   Substantial Evidence

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966); <u>see</u> <u>Timken Co. v. United States</u>, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988) ("It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record.") (citation omitted).  Moreover, "[t]he [C]ourt may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it <u>de novo</u>. . . .'"  <u>American Spring Wire Corp. v. United States</u>, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting <u>Penntech Papers, Inc. v. NLRB</u>, 706 F.2d

18, 22-23 (1st Cir. 1983) (quoting, in turn, <u>Universal Camera</u>, 340 U.S. at 488)).


## II.  <u>Chevron</u> Two-Step Analysis

In determining whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court applies the two-step analysis prescribed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to ascertain whether "Congress has directly spoken to the precise question at issue." <u>Id.</u> at 842.  To determine "whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing <u>Chevron</u>, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning." <u>Id.</u> (explaining that "a statute's text is Congress's final expression of its intent") (citing <u>VE Holding Corp. v. Johnson Gas Appliance Co.</u>, 917 F.2d 1574, 1579 (Fed. Cir. 1990)).  If the statute's plain language answers the question, "that is the end of the matter." <u>Id.</u> (citing <u>Muwwakkil v. Office of Personnel Management</u>, 18 F.3d 921, 924 (Fed. Cir. 1994)).  Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory

construction, and legislative history."  Id.; but see Flora Trade Council v. United States, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however.") (citing U.S. Steel Group v. United States, 22 CIT __, 998 F. Supp. 1151, 1157-58 (1998) (rejecting the use of the maxim expressio unius est exclusio alterius to discern Congress's intent under Chevron step one)).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible.  See Chevron, 467 U.S. at 843.  Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996); see also Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).  Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992); see also Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another.").  The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including

whatever fairly detracts from the substantiality of the evidence." Negev Phosphates, Ltd. v. United States, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole.

## DISCUSSION

### I. Calculation of the Antidumping Duty Assessment Rate

#### A. Background

This case arises from the final results of the antidumping duty order on tapered roller bearings and parts thereof manufactured by a foreign manufacturer, Koyo Seiko Co., Ltd., and imported from Japan by Koyo Corporation of U.S.A. ("KSU"), a subsidiary of Koyo, which through its sales and distribution division, Koyo Corporation of U.S.A.-Sales Division, was an exclusive importer of merchandise produced by Koyo Seiko Co., Ltd., during the review period of October 1, 1996 through September 30, 1997. See Final Results, 63 Fed. Reg. at 63,860. In the subject review, Commerce, following its usual practice in ascertaining cash deposit rates and assessment rates, stated that "[t]he cash deposit rate has been determined on the basis of the selling price to the

first unaffiliated U.S. customer.  For appraisement purposes, where information is available, [Commerce] will use the entered value of the merchandise to determine the assessment rate."  Final Results, 63 Fed. Reg. at 63,876.

Any of Commerce's findings concerning assessment rates and cash deposit rates is subject to 19 U.S.C. § 1675(a)(1)(B) (1994) which provides that Commerce shall "review, and determine (in accordance with paragraph(2)), the amount of any antidumping duty . . . ."  Paragraph two further states that the dumping margin "shall be the basis for the assessment of . . . antidumping duties on entries of merchandise . . . ."  19 U.S.C. § 1675(a)(2)(C).

The dumping margin (equal to the amount of antidumping duty owed) is the amount by which normal value ("NV") exceeds the export price ("EP") or constructed export price ("CEP") on the subject merchandise sold during the period of review ("POR").[2]  See 19 U.S.C. § 1677(35) (1994).

NV is the comparable price for a product like the imported merchandise when first sold (generally, to unaffiliated parties)

---

[2] Because Koyo had only constructed export price ("CEP") sales during the period of review ("POR"), Koyo's arguments address only the calculation of the assessment rate for CEP sales.  See Koyo's Reply Br. at 2 n.1. However, for the purpose of our analysis, the outcome would be identical if Koyo had both export price ("EP") and CEP or only EP sales during the POR.

"for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i) (1994).

The export price means the "price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser," while the constructed export price is the "price at which the subject merchandise is first sold . . . in the United States . . . [by] producer or exporter . . . to a purchaser not affiliated with the producer or exporter . . . ."  19 U.S.C. § 1677a(a),(b) (1994).

Cash deposit is a provisional remedy.  When Commerce directs Customs to suspend liquidation upon a preliminary determination of dumping, the importer must make a cash deposit of estimated antidumping duties with Customs or post a bond or other security. See 19 U.S.C. § 1675(a)(2)(B)(iii); accord General Agreement on Tariffs and Trade, Oct. 30, 1947, 61 Stat. A-3, 55 U.N.T.S. 187 ("GATT 1947").  Commerce orders the posting of a cash deposit in an amount equal to the estimated average amount by which the foreign market value exceeds the United States price, that is, the dumping margin.  19 U.S.C. § 1673b(d)(1)(B) (1994); see also 19 U.S.C. § 1673e(b) (1994) (applying similar calculation for Commerce's final

determination).  Commerce then calculates the cash deposit rate by dividing "'the aggregate dumping margins by the aggregated United States prices.'"  See, e.g., National Steel Corp. v. United States, 20 CIT 743, 746, 929 F. Supp. 1577, 1581 (1996) (citing 19 C.F.R. § 353.2(f)(2) (1993)); accord 19 U.S.C. § 1677(35)(B) (stating that "'weighted average dumping margin' is the percentage determined by dividing the aggregate dumping margins . . . by the aggregate export prices . . . .").  Commerce interprets the term "United States price" as the sale price after Commerce has made all adjustments as provided for by law.  See National Steel, 20 CIT at 746, 929 F. Supp. at 1581 (citing 19 C.F.R. § 353.41(d)(iii) (1993)).

When an antidumping duty is imposed upon imported merchandise, Commerce calculates an assessment rate for each importer by dividing the dumping margin for the subject merchandise by the entered value of such merchandise for normal Customs purposes.  See 19 C.F.R. § 351.212(b).

In promulgating 19 C.F.R. § 351.212(b), Commerce reasoned as follows:

> [Section] 351.212(b)(1) [deals] with the method that [Commerce] will use to assess antidumping duties upon completion of a review. . . .  [Commerce] provided that it normally will calculate an "assessment rate" for each importer by dividing the absolute dumping margin found . . . by the entered value . . . .  [The rule] merely

codified an assessment method that [Commerce] has come to use more and more frequently in recent years.

Historically, [Commerce] (and, before it, the Department of Treasury) used the so-called "master list" (entry-by-entry) assessment method. Under the master list method, [Commerce] would list the appropriate amount of duties to assess for each entry of subject merchandise separately in its instructions to the Customs Services. However, in recent years, the master list method has fallen into disuse for two principal reasons. First, in most cases, respondents have not been able to link specific entries to specific sales, particularly in CEP situations in which there is a delay between the importation of merchandise and its resale to an unaffiliated customers. Absent an ability to link entries to sales, [Commerce] cannot apply the master list method. Second, even when respondents are able to link entries to sales, there are practical difficulties in creating and using a master list if the number of entries covered by a review is large. Preparing a master list that covers hundreds or thousands of entries is a time-consuming process, and one that is prone to errors by [Commerce] and/or Customs Service staff. . . .

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,314 (May 19, 1997).


B.    Contentions of the Parties

    1. Commerce's Contentions

Commerce contends that the calculation of the assessment rate pursuant to 19 C.F.R. § 351.212(b) by dividing the dumping margin by the entered value of the subject merchandise was reasonable and in accordance with law. See Def.'s Mem. In Opp'n to Pls.' Mot. J. Agency R. ("Def.'s Mem.) at 4-7.

According to Commerce, the requirement of 19 U.S.C. § 1675(a)(2) that the amount by which NV exceeds CEP (or EP)"be the basis for the assessment of . . . antidumping duties" is fully satisfied by the methodology devised in 19 C.F.R. § 351.212(b) because the first step of the calculation, the computation of the dumping margin (the numerator) as the difference between NV and Koyo's CEP, supplies the statutorily-prescribed basis for the entire formula set forth in 19 C.F.R. § 351.212(b).  Id. at 5-6 (citing Koyo Seiko Co. v. United States, 16 CIT 539, 796 F. Supp. 1526 (1992)).  Commerce further asserts that "[t]he purpose of using entered value in the denominator [in the formula for an assessment rate] is to allocate the dumping margin among the importers of the merchandise."  Id. at 4.

### 2.  Koyo's Contentions

In response, Koyo asserts that Commerce unlawfully calculated the antidumping duty assessment rate under 19 C.F.R. § 351.212(b) because Commerce used the entered value for the subject merchandise as the denominator in the formula.  See Pls.' Mem. Supp. Mot. J. Agency R. (Pls.' Mem.) at 6-8; Koyo's Reply Br. at 2-6. Koyo alleges that because 19 U.S.C. § 1675(a)(2)(A),(C) requires that the dumping margin be calculated as the difference between NV and CEP, and since NV and CEP are both price-based concepts, the logic of the statute necessitates that the denominator used in the

formula must also be a price-based concept, specifically, sales value.  See Koyo's Reply Br. at 2, 4.  Koyo, therefore, concludes that Commerce's use of entered value instead of sales value as the denominator is either unreasonable or in violation of the statutory language of 19 U.S.C. §§ 1675(a)(1)(B) and 1675(a)(2).  Id.

Furthermore, Koyo maintains that because Commerce always uses sales value as the denominator for calculating cash deposit rates, Commerce must apply the same calculation method to the assessment rates.  See Pls.' Mem. at 4.  Koyo argues that Commerce's use of different denominators for cash deposit rates and assessment rates creates a distinction between the two that conflicts with the mandate of 19 U.S.C. § 1675(a)(2).  See Koyo's Reply Br. at 4.

Finally, Koyo notes that Commerce's use of 19 C.F.R. § 351.212(b) is unreasonable as applied because all of Koyo's merchandise for the POR was imported solely by KSU and, therefore, Commerce's purpose of using entered value as the denominator in order to "'allocate the dumping margin among importers of the merchandise produced'" has no relevance to Koyo's situation.  Id. at 3.

Although Koyo concedes that this Court upheld Commerce's methodology for calculating the assessment rates in Koyo Seiko Co. v. United States, 16 CIT 539, 796 F. Supp. 1526 (1992), vacated in

part on other grounds, 806 F. Supp. 1008 (1992) ("Koyo 1992"), Koyo
asserts that the issue was not finally resolved by a determination
by the Court of Appeals for the Federal Circuit ("CAFC"). See id.
at 5-6; Pls.' Mem. at 5.

### 3.    Timken's Contentions

Contrary to Koyo and in support of Commerce, Timken contends
that the language of 19 U.S.C. §§ 1675(a)(1)(B) and (a)(2) permits
Commerce's methodology for calculating assessment rates because the
mere fact that the numerator is calculated as the difference
between NV and CEP satisfies the statutory requirement to use the
differential as the basis for the entire formula. See Timken's
Resp. to Pls.' Mem. Supp. J. Agency R. ("Timken's Resp.") at 4-5.
Timken also points out that, contrary to Koyo's claim, there is
binding precedent by the CAFC upholding Commerce's methodology for
purposes of calculating cash deposit rates and assessment rates.
Id. at 6-7 (citing Torrington Co. v. United States, 44 F.3d 1572
(Fed. Cir. 1995)).

### C.    Analysis

The issue presented by Koyo is whether 19 U.S.C. §§
1675(a)(1)(B) and (a)(2) require Commerce to calculate assessment
rates using sales value, rather than entered value.

The Court's analysis begins with an examination of the relevant statutory provisions. Section 1675(a)(1)(B) provides that Commerce shall "review, and determine (in accordance with paragraph(2)), the amount of any antidumping duty . . . ." Paragraph two states that the amount by which normal value exceeds export price (or constructed export price) "shall be the basis for the assessment of . . . antidumping duties on entries of merchandise . . . ." 19 U.S.C. §§ 1675(a)(1)(B),(a)(2).

Koyo contends that this language indicates Congress has directly spoken to the precise question at issue, dictating that the sales value should be used as the denominator for the purposes of calculating assessment rates. See Koyo's Reply Br. at 4. However, the plain language of the statute does not positively speak to the question at issue. It merely provides that the difference between NV and CEP (or EP) "shall be the basis" for the assessment of duties. 19 U.S.C. § 1675(a)(2). In fact, there is nothing in 19 U.S.C. §§ 1675(a)(1)(B) or (a)(2) which states that Commerce is prohibited from using any concepts other than NV and EP (or CEP) to devise the formula for assessment rates. If Congress wanted to create a precise formula or exclude all other concepts from any part of the calculation, it would have said so in clear and unequivocal terms. See United States v. Int'l Bus. Machs. Corp., 892 F.2d 1006, 1009 (Fed. Cir. 1989). Congress' choice to

designate just the first step in the calculation indicates that Congress purposely left the task of devising the formula to Commerce's expertise.

Because the language of the statute is not dispositive, we turn to the legislative history of 19 U.S.C. §§ 1675(a)(1)(B) and (a)(2) to determine whether Congress has "directly addressed the precise question at issue." Chevron, 467 U.S. at 843; Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 667 (Fed. Cir. 1992). The language of 19 U.S.C. § 1675(a)(2) derives from 19 U.S.C. § 1673(2)(B) (1994), which states that "there shall be imposed upon . . . merchandise an antidumping duty . . . in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." Section 1673(2)(B) is, in turn, a result of Congressional amendment to the antidumping laws by reason of the URAA. See Sharp Corp. v. United States, 63 F.3d 1092, 1093 (Fed. Cir. 1995). Although many of the statutory terms have been renamed under the the URAA (e.g., "export price" replaced "purchase price," "constructed export price" replaced "exporters sales price," and "normal value" replaced "foreign market value"), the substance of these terms remained the same as it was before the amendments. See Sharp, 63 F.3d at 1093 n.1. The URAA amendments, in turn, adopted the standard definition of dumping employed by Article VI of GATT

1947.  See, e.g., Raj Bhala, International Trade Law, Cases and materials 649 (1996).  Thus, the Congressional choice of language found in 19 U.S.C. §§ 1675(a)(1)(B) and 1675(a)(2) is a result of the evolution of antidumping law.  There is nothing in the history of GATT 1947, the URAA, or 19 U.S.C. §§ 1675(a)(1)(B) and (a)(2) that indicates any intent to designate a specific denominator for the assessment rate formula.  Therefore, the Court concludes that neither the statute nor its legislative history provides an "unambiguously expressed intent" with regard to the precise question at issue. Chevron, 467 U.S. at 843.

In situations where Congress has not provided clear guidance on an issue, the Chevron test requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable.  See Chevron, 467 U.S. at 845; Koyo Seiko, 36 F.3d at 1570; IPSCO, 965 F.2d at 1061.  Therefore, we are to examine whether Commerce's promulgation of 19 C.F.R. § 351.212(b) was reasonable under the statutory mandate.

Section 1675(a)(2) provides that the dumping margin "shall be the basis for the assessment . . . of antidumping duties on entries of the merchandise . . . ."  19 U.S.C. § 1675(a)(2)(C).  Koyo argues that Commerce's inclusion of the entered value in the assessment rate formula is unreasonable in view of this language. See Koyo's Reply Br. at 2, 4.  This Court disagrees.  Congress' use

of the term "basis" does not manifest its intent to tie the minuend and subtrahend of the dumping margin calculation to the denominator used in the assessment rate formula.

The dictionary definition of "basis" is "the principal component." BLACK'S LAW DICTIONARY 151 (6th Ed. 1990). Congress' use of the term "basis" implies neither exclusivity of components nor similarity among them. The statutory language simply means that the dumping margin should be a principal component of the calculation and Commerce fully satisfied this requirement. As this Court has already stated, "Commerce did in fact calculate the dumping margins as the difference between foreign market value and the U.S. price, which was therefore the basis for the assessment of dumping duties" in accord with the requirements of 19 U.S.C. § 1675(a)(2). Koyo 1992, 16 CIT at 541, 796 F. Supp. at 1529. Commerce's use of a figure different from NV or EP (or CEP) as the denominator in the assessment rate formula is not unreasonable under the statutory mandate.

Koyo maintains that Commerce's use of the entered value was an unreasonable choice "[b]ecause [when] the basic building blocks for the margin calculation [,that is, NV and CEP,] . . . are all based on price, . . . the only lawful ratio by which to establish the assessment rates is one in which the denominator is also based on sales value . . . ." Pls.' Mem. at 8. In essence, Koyo alleges

that among other choices, Commerce's use of the "entered value" concept as the denominator was in violation of the logic of the statute because entered value is entirely divorced from sale. Koyo's Reply Br. at 2, 6. This claim is unwarranted. Traditionally, the entered value of merchandise for normal Customs purposes is equal to the invoice value of the subject merchandise less freight, insurance premium costs and other applicable non-dutiable charges. See Mitsubishi Int'l Corp. v. United States, 78 Cust. Ct. 4, C.D. 4686 (1977); Pistorino & Co. v. United States, 65 Cust. Ct. 387, C.D. 4110 (1970); S. Vollman & Sons v. United States, 10 Cust. Ct. 532 (1943); Mitsui & Co. v. United States, 7 Cust. Ct. 598 (1941); United States v. Von Hamm Young Co., 1 Cust. Ct. 597 (1938). The invoice value, in turn, is defined as the purchase price of the subject merchandise or, "in the case of merchandise not purchased or consigned for sale, a statement of the fair retail value in the country of shipment." 19 C.F.R. § 145.11(b) (1998). Therefore, the entered value of the subject merchandise is an adjusted purchase price of the merchandise, clearly a sales-related concept. If Koyo's desire is to have a sales-related concept for the denominator, the Court points out that Commerce's current methodology already satisfies Koyo's wish.

Alternatively, Koyo alleges that Commerce's methodology is unreasonable as applied in view of the fact that (a) Koyo Seiko

Co., Ltd. has only one importer of its merchandise, KSU, its subsidiary, and (b) Commerce's argument for using entered value as the denominator is to "allocate the dumping margin among [different] importers." Koyo's Reply Br. at 3. Koyo asserts that the assessment rate formula is inapplicable to Koyo's particular situation. <u>Id</u>. The statement suffers from multiple flaws.

First, Koyo fails to observe that in addition to its desire to allocate the dumping margin among importers, Commerce had other valid motives for adopting entered value as the denominator, for example, administrative ease, accuracy, promptness and efficiency. <u>See</u> <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. at 27,314-315.

Second, this Court is not aware of any prohibition against allocating the dumping margin among the merchandise of one importer.

Third, it would be unreasonable, if not anomalous, for Commerce to devise an assessment rate formula for importers enjoying exclusivity with manufacturers different from the formula applied to all other importers. This approach would allow manufacturers and importers to manipulate assessment rates by changing the number of importers. It would also unfairly disadvantage those importers who, because of contractual

obligations, unfavorable fluctuations of market, or because they are at the initial stages of business development and are faced with financial constraints, are unable to engage in exclusive import arrangements.  Commerce is not expected to cater to Koyo's private circumstances based on Koyo's preferences in doing business, its corporate structure or business needs.

Finally, Koyo argues that the methodology for calculating assessment rate is unreasonable because it differs from that used for calculating cash deposit rates.  See Pls.' Mem. at 6-8; Koyo's Reply Br. at 4.  Koyo claims the distinction is not authorized by 19 U.S.C. § 1675 (a)(2)(C).  See Koyo's Reply Br. at 4.  Koyo is incorrect.  As Timken correctly points out, the issue was already resolved by Torrington Co. v. United States, 44 F.3d 1572 (Fed. Cir. 1995) where the CAFC held that:

> Section 1675(a)(2) does not require the same method of calculation for assessment rates and cash deposit rates.  Nor does it specify a particular [denominator] when calculating either assessment rates or cash deposit rates. Rather, the statute merely requires that [the dumping margin], the difference between foreign market value and United States price, serve as the basis for both assessed duties and cash deposits of estimated duties. . . .  [The] use of different methods for calculating these rates does not conflict with the statute.

Id. at 1578.

Furthermore, § 1675(a)(1)(B) and (a)(2) do not state that the assessment rates for each entry of subject merchandise must be

identical to cash deposit rates. Had Congress wanted both figures to be the same, it would have stated so in definite terms rather than merely provide a basis for these two different calculations. Commerce's practice reflects the fact that cash deposits are nothing but estimates of future dumping liabilities and, because the Tariff Act merely requires that both the deposit rate and the assessment rate be derived from the same dumping margin differential, there could be no certainty that the cash deposit rate would be equal to the actual assessment. See generally Certain Hot-Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom; Final Results of Countervailing Duty Administrative Review, 60 Fed. Reg. 54,841 (Oct. 26, 1995); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews, 57 Fed. Reg. 28,360 (June 24, 1992). A cash deposit rate may differ from the assessment rate and, if actual duty levels exceed the cash deposits, Commerce instructs the Customs Service to collect the difference. See, e.g., Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order, 58 Fed. Reg. 39,729 (July 26, 1993).

## CONCLUSION

In light of the above and the considerable discretion that Congress afforded Commerce in §§ 1675(a)(1)(B) and (a)(2), the

Court finds Commerce's methodology reasonable and sustains its methodology for calculating the assessment rate.  See ICC Indus., Inc. v. United States, 812 F.2d 694, 699 (Fed. Cir. 1987); Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc., 753 F.2d 1033, 1039 (Fed. Cir. 1985).

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     June 1, 2000
           New York, New York

## **Erratum**

Slip Opinion 00-62

Koyo Seiko Co., Ltd. v. United States

On page 2, "Michelle D. Lynch" should read as follows: "Michele D. Lynch."

June 2, 2000

**<u>Errata</u>**

Slip Opinion 00-62

<u>Koyo Seiko Co. v. United States</u>, Court No. 99-01-00001

On page 7, line 1, "Flora Trade" should be "Floral Trade."

On page 17, line 18, "under the the URAA" should be "under the URAA."

September 20, 2000